## THE GATE CITY.

### (District Court, E. D. New York. May 27, 1898.)

1. COLLISION—STEAMER AND SAIL—SCHOONER'S LIGHTS—PRESUMPTIONS.
    That the lights of a schooner were not seen by an approaching steamer; that it may have been possible for the schooner's fore staysail to swing so far to port as to obscure her port light; and that this position would, in the condition of the wind, have best aided her progress,—is not sufficient to raise a presumption that such was its position, as against the positive testimony of her master that it was trimmed flat, aided by the presumption that the schooner would not so adjust her sails as to hide her lights.

2. SAME—CHANGE OF COURSE BY SAILING VESSEL.
    The rule requiring a sailing vessel meeting a steamer to hold her course is a broad and general one, intended to put the burden of avoiding a collision upon the steamer; and, if the sailing vessel departs from the injunction, the burden is on her to show some reasonable excuse therefor. A disregard of the rule, not demanded by a clearly existing exigency, should not be excused. Therefore she will not be held in fault for adhering to her course, although the steamer seems to be maneuvering in an uncertain and dangerous way.

3. SAME—NEGLIGENCE OF STEAMER.
    A steamer colliding with a schooner on the open sea at night *held* solely in fault for failing to observe the schooner's lights, and for leaving a course which would have carried them well clear port to port, and going across the schooner's bow, the latter having kept her course until in extremis.

This was a libel in rem by John W. Hall against the steamship Gate City to recover damages caused by a collision between her and libelant's schooner, Joel Cook. The New England & Savannah Steamship Company filed a libel in personam against libelant, to recover for damages suffered by the Gate City.

Wilcox, Adams & Green, for John W. Hall.
Seward, Guthrie & Steele, for the Gate City.

THOMAS, District Judge. On the 3d of September, 1897, the steamship Gate City, one of a regular line of steamers plying between Savannah, Ga., and New York, and carrying freight and passengers, was on her north-bound trip from Savannah, and at 2 o'clock a. m. was about off Egg Harbor Light, on the coast of New Jersey. The schooner Joel Cook had sailed from New York on the 2d of September, at about 1 o'clock p. m., bound for Lewes, Del., and at 2 o'clock in the morning of September 3d was headed S. W. by S. ½ S., with the wind N. W. About 5 or 10 minutes past 2 o'clock in the morning, the two vessels collided, the schooner striking the steamer on the starboard side, abaft amidships. The steamer was seriously injured, and the schooner also received substantial injury. The night was dark,

but clear. The schooner was carrying all sails, and, as her master testified, the head sails were trimmed flat, and not changed up to the time of the collision. The steamer's course was N. E. by N. $\frac{1}{2}$ N., which was changed to N. N. E. while she was yet several miles from the schooner. The schooner's course was S. W. by S. $\frac{1}{2}$ S. When the steamer was seen by those on the schooner, the former was from half a point to a point off the schooner's port bow. Had these courses been maintained, the vessels would have passed each other port to port, at an interval of about half to three-quarters of a mile. Those in charge of the schooner saw the steamer's red light when the latter was three or four miles away, and such light was alone seen until the steamer was about half a mile from the schooner, when the master of the schooner saw what her captain described as a ray of the steamer's green light. When this interval was reduced to about 300 feet, as the captain of the schooner testified, the steamer suddenly showed her green light, which resulted from the steamer's starboarding, and shortly thereafter hard a-starboarding. Thereupon the schooner ported, but the collision at this time was inevitable. The evidence on the part of the steamer was to the effect that those in charge of her saw no lights whatever on the schooner before the accident, at the time of the accident, or thereafter. About half a mile to a mile on the starboard side of the schooner was a long tow, showing the usual lights, pursuing a course opposite to that of the schooner; and the courses of the tow, the schooner, and the steamer were substantially parallel. The further essential facts are stated below.

The first point to be considered is whether the schooner was carrying proper lights, and whether persons in charge of the steamer, using proper care, could have seen them. Several persons, including the master, connected with the schooner, testified that such lights had been prepared, put in place, and that they were burning through the night, and that, owing to the confusion and condition of the schooner after the collision, the lights were not removed until after 8 o'clock next morning. Applying the usual rules as to probabilities, as to the opportunities of these persons to know the fact, and to the preference accorded to the evidence of such persons, provided it be otherwise credible, it must be concluded that such lights did exist, and that they were properly placed. In this connection it may be said that the nice unanimity of these witnesses, the particularization of the care stated to have been used by them to know that the lights existed, indicate very great solicitude on the part of the schooner's crew as to the lights, and remarkable observation of the same, or that they exaggerated the extent of their diligence and painstaking concerning the matter. Should the latter alternative be adopted, the court does not consider that such exaggeration is sufficient to justify a finding that the lights did not properly exist. The proof in this regard is not overcome by the evidence of those upon the steamer, to the effect that there were no lights on the schooner. There was a long and well-lighted tow on the starboard side of the schooner. The steamer, with its usual lights and cabin lights, for some time had been in full view; and it is not easily conceivable, under the circumstances, and with the

knowledge that the coast was a pathway for ships, that the schooner would have neglected, not only the commands of the law, but also the requirements of prudent navigation. Those on the steamer had just come on watch. The lookout, the man at the wheel, and the first mate had taken up their duties but a few minutes before. Their opportunities for observation had been brief. They were attracted, probably not entirely, to the tow, which they were passing. Individually, the witnesses for the steamer do not impress the court, either on account of intelligence, correctness of observation in other particulars, or superior manifestations of veracity, as entitled to preference regarding this fact in issue. The counsel for the steamer does not accept their evidence for the purpose of working out his theory of the collision. While not condemning either their purpose to state the truth, or abandoning their evidence in all particulars, he seeks to solve the cause of the accident upon grounds which are skillfully selected, and which, although not finally adopted by the court, have received thorough consideration.

It is urged that, admitting for the argument that the schooner's lights existed, yet that, as the schooner claims that the steamer was approaching the schooner on the latter's port bow, the port light was hid by the fore staysail, which swung so far to port as to hide such light; and measurements and drawings are submitted to show the possibility of this alleged fact. The measurements of the boom, of the sail, of the location of light, of the width of the ship, are not accurate measurements, but are gathered from some general estimate given by the master of the schooner. They seem to show with sufficient clearness that it was possible to swing the sail so far to port as to conceal the port light. Granting this possibility, did that condition exist? The schooner's course was S. W. by S. $\frac{1}{2}$ S. The wind was N. N. W. The advocate for the steamer states:

"The schooner was running free on the starboard tack, with the wind on the starboard quarter, and the booms all out to port. The steamer was not more than half a point to a point on the schooner's port bow; that is, nearly dead ahead. The schooner was light, had all sails set, including four head sails, and the wind was blowing an eight-knot breeze. Under these circumstances, she must have heeled over to port considerably."

The argument then continues to illustrate that under such circumstances, and with the measurements claimed to be approximately correct, the port light was probably concealed. The theory thus adopted by the steamer would concede all the essential positions of the schooner save one, and that is the position of the fore staysail. The master of the schooner states that it was and had been trimmed flat. The counsel for the steamer claims that it swung away to port. For this latter claim there is no evidence, and the court is asked to make the assumption that such was the case (1) because the wind, blowing as it did, would best aid the sailing of the vessel with the sail thus placed; (2) because such assumption that the sail was free, and swung well to port, would account for the failure of those on the steamer to see the schooner's lights.

If the master of the schooner had stated that his sails were set, and

had for some time been set, so as to add nothing to the speed of the ship, or to diminish her speed, and no explanation was given, it might be concluded that they were set so as to catch the wind and aid the sailing. But in the present case the sails, if set, as claimed by the master, would facilitate the sailing, although perhaps not to the same extent as if carried in a position further to port. This presumption, which the court is asked to accept, that the schooner would so adapt her sails as to obtain the highest sailing power, is confronted by the presumption that the schooner would not adjust her sails so as to obscure her light, upon whose appearance her own safety and the safety of other vessels might depend. The presumption of fact thus argued is met by the contrary testimony of the master, and by another presumption, at least equally strong.

As to the other proposition, that an adoption of the theory would harmonize the evidence, and account for the failure of the steamer's crew to see the schooner, the argument is this: (1) There were lights on the schooner. (2) The steamer's crew did not see the lights, and declared that she carried none. (3) This could be accounted for by assuming that the fore staysail was swung so far to port as to conceal the port light. This argument is that, rather than conclude that the watch of the steamer did not use due care, it is to be assumed that the schooner neglected her duty, and exposed herself and others to danger by hiding her lights, and that such assumption should be preferred to the direct evidence that such was not the condition of the sail. However well this theory delivers the steamer's crew from an appearance of transgression at the time of the accident and upon the witness stand, it involves the schooner's crew in a like transgression on both occasions. It is a mere theory, unsupported by a single item of substantial evidence, and disputes evidence which at least has the merit of being in existence. Moreover, while this theory would account for the failure of the steamer's crew to see the port light, it does not account for the failure of the steamer's watch to discover the schooner's starboard light. They saw no light on the schooner at any place or at any time, before the accident, at the time of the accident, or after the accident. They were in a position at some time to have seen her green light, but no one of the steamer's watch, consisting of the captain, mate, pilot, and lookout, admits that he did see it, and several of them testified that it was not there. Disregarding, for this question, the evidence of the mate of the steamer, that the schooner was so related to his ship that he would have seen the former's green light if there had been one, yet there was a time just before the collision when the green light would have been in full view, and bearing down full upon him. It is suggested that, in the peril of the moment, it was overlooked. But it is precisely the incident that should have been noticed at such a time, because it was a signal of the approaching peril. Moreover, the schooner was struck, pulled around to windward, so that at some time the steamer was placed in every favorable position to see both lights; and yet at all times those in charge of the steamer claimed that they did not discover the slightest evidence of any lights. If, now, the lights existed,

the failure of the steamer to see them is not accounted for by an assumption, unsupported by evidence, that the fore staysail might have obscured the port light.

The remaining fault urged against the schooner is that it did not use due care to avoid the result of the steamer's negligence, in case that should be found to exist. That those in charge of the steamer were negligent results from the view already expressed. The steamer, when first seen by the schooner, was headed N. E. by N. ⅓ N.; and later, while yet at some distance away from the schooner, the steamer was headed N. N. E., and was half a point off the schooner's port bow. The schooner at this time was headed S. W. by S. ⅓ S.. Had these courses been maintained, the vessels would have passed each other on the port side, and no accident would have happened. Those in charge of the steamer state that they saw the schooner off their starboard bow, but evidently this was only later, and when the vessels were quite near to each other. Under these circumstances, the steamer changed its course to one directly across the bows of the schooner, which kept its course. The rule required the steamer to avoid the schooner; but, instead of doing so, she placed herself directly in the schooner's path. No fact appears tending to mitigate her fault. Her crew seek to explain this by saying that the schooner was on the steamer's starboard bow when first seen; that the steamer was at once starboarded; then very shortly afterwards hard a-starboarded; and then, when the collision was at hand, ported to swing the steamer's stern to the starboard of the schooner, and thereby clear the schooner. But this statement that the schooner, at the earlier time, when she should have been seen, was on the steamer's starboard side, cannot be accepted. In fact, such proposition is not adopted by the advocate representing her on the trial, and is clearly untenable. That such was the fact when the vessels were in extremis is undoubted; and the evidence of the witnesses in behalf of the steamer must be held to relate to a time shortly before the collision. Hence it must be held that the steamer, sailing upon a course a half point off the schooner's port bow, and upon a course which, if maintained, would have taken her safely past the schooner, on the side, changed that course, heading across the schooner's bow, and towards the tow, which was on the starboard side of the schooner. This was the cause of the accident.

But it is urged that the schooner was also in fault. The argument is this: (1) The master of the schooner first saw the steamer's port light, which for some time indicated her course. (2) Later, and when the vessels were about a half mile apart, a ray of the steamer's green light appeared, and later, and when the steamer was some 300 feet away, such light opened, and was fully disclosed. (3) This showed the captain of the schooner that the steamer was taking an erratic course across the schooner's bow, in a manner highly dangerous to both vessels, and yet he kept on his course. (4) The captain of the schooner, when urged upon cross-examination to give his opinion concerning the same, likened the maneuver which the steamship attempted to the act of a crazy man. (5) Under such a state of facts,

the schooner should have shown a flash light, or have tried to go to port, to avoid the steamer.

In the first place, the rule requires the schooner to keep her course. It can hardly be said that no exigency could arise that would require a modification of the duty enjoined by this rule. It would be strange if any rule could be so comprehensive in its wisdom and usefulness that no departure from its terms would ever be required, however great the danger of observing it, and however salutary a departure from it. Nevertheless, it is a broad and general rule, intended to place the burden of avoiding a collision with a sailing vessel upon the approaching steamer. This exemption given to the sailing vessel is a constraint upon her. If she departs from the injunction that she shall keep her course, the burden is upon her to show some reasonable excuse therefor. A frequent disregard of the rule, a disregard not demanded by a clearly existing exigency, should not be excused. In the present case the schooner did, when the peril was fully apparent, try to go to port. The argument is that the master should have discovered the peril at an earlier moment. It was not a question of minutes, but of seconds. While the master did see a ray of the steamer's green light a half a mile away, yet the light itself came suddenly into view, when the vessels were not over 300 feet apart, and indicated a change of the course which the steamer had been pursuing for several miles, during which time the captain of the schooner was seeing and watching her red light. It is true that this witness states that, if the steamer had pursued the course indicated by the ray of the green light on the steamer, the latter would have struck the schooner pretty near head-on, although her previous course would have enabled the vessels to clear with an interval of a half or three-quarters of a mile. Should the master, when he saw this ray of green light, have starboarded? Should he have changed, so as to run across the steamer's original course?

The combined speed of the schooner and steamer was such that the interval of half a mile would have been covered in little over a minute. When the green light fully and suddenly appeared, they were 300 feet apart. This space was covered in a few seconds, probably not more than 10 or 15 seconds. It does not appear that the master of the schooner should have been so keenly alive to this suddenly manifested intention of the steamer to change her course as to require him to change his course, and the course enjoined by law upon him, so as to take up a course across the course that had for several miles been pursued by the steamer, and which course it showed but a faint intention to change,—an intention manifested by the ray of the green light. When the vessels were but a few hundred feet apart in distance, and some 10 or 15 seconds in time, with the burden of meeting the sudden abberation of the steamer, the vessels were in extremis; and it cannot be said, justly at least, that the schooner was at fault because she did not, with sufficient quickness, grasp the situation, and hard a-starboard, thereby abandoning her course, her previous duty, and her right of way. The steamer was where she was by her own gross fault, and in disobedience of all rules. The schooner was where she was of

right, and pursuant to all rules. The peril swiftly impended. She endeavored to starboard, but the recklessness of the steamer had precluded all possibility of avoiding the collision. The master of the schooner was required to act in a crisis, which he had in no part created. If he did not act with the highest wisdom and the supreme quickness required, he is not to be condemned. The authorities for this proposition are so abundant and controlling as to require no ·citation.

But it is said that she should have shown a flash light. At what time? When the ray of green light first appeared? When the green light suddenly appeared? When the steamer was a minute or a minute and a half away in time? When she was 15 seconds away? What has been said as to changing her course applies equally to this duty, which the steamer would now impose on the schooner. It requires a superlative diligence, apprehension, grasp of circumstances, and appreciation of dangers not required of her by law. She was carrying the lights required by law, and was not required to have a flash light in readiness, so that it could be sent off if a steamer chanced to run across her course, with scarcely more than a minute's, and possibly a few seconds', warning.

In conclusion, it may be stated that, in the opinion of the court, the accident was caused by the failure of the steamer to see the schooner's light, and that this happened from the fact that the watch on the steamer was changed, and the new watch was not advised of the sailing vessel, and had so recently come on deck that they did not themselves discover her. A decree should be entered in favor of the libelant, John W. Hall, against the steamship Gate City, for the damages to the schooner Joel Cook, arising from the collision, to be ascertained by a commissioner, with costs; and a decree should be entered dismissing the libel filed by the New England & Savannah Steamship Company against John W. Hall, with costs to the respondent.