WILDER'S S. S. CO. et al. v. LOW et al.

(Circuit Court of Appeals, Ninth Circuit. November 4, 1901.)

No. 684.

**1. CIRCUIT COURT OF APPEALS—JURISDICTION—APPEALS FROM DISTRICT COURT OF HAWAII.**

Section 86 of Act April 30, 1900, providing a government for the territory of Hawaii, after defining the jurisdiction of the district court of the United States for the district of Hawaii, giving it the jurisdiction of both a district and circuit court of the United States, provides that "writs of error and appeals from said district court shall be had and allowed to the circuit court of appeals in the Ninth judicial circuit in the same manner as writs of error and appeals are allowed from circuit courts of appeals as provided by law." *Held*, that such provision did not restrict the appellate jurisdiction of the circuit court of appeals to causes tried by the district court when acting as a circuit court, but was sufficiently comprehensive to give such right of review in all causes which would be so reviewable if tried in a district or circuit court of the United States, the phrase "in the same manner" having reference to the procedure only; and that a decree in admiralty rendered by such district court was appealable.[1]

**2. ADMIRALTY—REVIEW ON APPEAL—QUESTIONS OF FACT.**

When two courts have considered the facts, and reached the same conclusion as to the fault for a collision, the burden rests upon an appellant to show that such decisions were manifestly wrong before the judgment of the lower court will be reversed.

**3. COLLISION—INTERNATIONAL RULES—DUTY OF STEAM VESSELS.**

The suggestion in the preliminary note to article 17 of the international navigation rules (26 Stat. 320), relating to sailing vessels approaching one another, that, if the compass bearing of an approaching vessel does not appreciably change as the two vessels draw nearer together, there should be deemed to be risk of collision, is not a rule of navigation, but merely a suggestion of one circumstance which denotes that there is danger of collision; and a steamer is not justified in assuming that there is no risk because there is an appreciable change in the compass bearing of the lights of a sailing vessel seen at night, which would manifestly be an unwarranted assumption under some circumstances.[2]

**4. SAME.**

Under the settled rule of the admiralty courts it is the duty of a steamer, when the lights of an approaching vessel are fluctuating, or for any reason there appears to be uncertainty as to her course, to slacken speed, and, if necessary. stop, neither proceeding nor changing course until the course of the other vessel has been ascertained; and this duty is specifically imposed by article 23 of the navigation rules upon a steam vessel which is required to keep out of the way of another vessel.

**5. SAME—FAILURE TO MAINTAIN LOOKOUT.**

For an officer to leave his vessel entirely without a lookout, especially when another vessel is known to be in the vicinity. is culpable negligence, and approaches very nearly the line of reckless navigation. Where it is shown that a steamer had no lookout at night, and failed to station one, although the officer in charge saw the lights of another vessel ahead 10 minutes before collision, but was unable to make them out distinctly, every doubt will be resolved against such steamer in an action for the collision.

---

[1] Jurisdiction of circuit court of appeals, see note to Lau Ow Bew v. U. S., 1 C. C. A. 6; Emigration Co. v. Gallegos, 32 C. C. A. 475.

[2] Collision rules, see notes to The Niagara, 28 C. C. A. 532; The Mount Hope, 29 C. C. A. 368.

**6. SAME—STEAMER AND SAILING VESSEL CROSSING—EVIDENCE CONSIDERED.**

In an action against a steamer for collision with a barkentine in the night, in which the latter was sunk, the weight of evidence sustained the claim of the barkentine that she kept her course, and carried proper lights, which were burning brightly. On the other hand, it appeared that the steamer had no lookout; that the officer in charge saw the lights of the barkentine some 10 minutes before the collision, and when they were probably 2 miles distant, but was unable to make out the character or course of the other vessel; that he took no steps to ascertain, and continued at full speed of 10 knots, keeping his course, until about 2 minutes before the collision, when it was changed a few points to starboard, in which direction the barkentine was moving. *Held,* that the steamer was in fault for the collision, not only because of the presumption against her arising from the rule requiring her to keep out of the way, but because the evidence showed that her navigation was improper and negligent.

Appeal from the District Court of the United States for the Territory of Hawaii.

This is a suit in admiralty, brought in the district court of Hawaii, to recover damages for loss of cargo and personal belongings caused by a collision between the steamer Claudine and the barkentine William Carson, wherein the latter vessel was sunk. The lower court rendered a decree in favor of the libelants, to reverse which this appeal is brought. The appellant Wilder's Steamship Company was the owner of the steamship Claudine, which vessel is alleged to have been of the value of $125,000 at the time of the collision. The barkentine William Carson was an American vessel of about 791 tons burden, owned by George U. Hind and others, and at the time when the cause of action arose was employed in a voyage between Newcastle, N. S. W., and Honolulu, H. I. It is alleged that on the evening of December 27, 1899, at about 8:40 p. m., the said barkentine William Carson was within about 12 miles from Honolulu harbor, sailing free on a southwest course at a speed of between 2 and 3 knots an hour; that she was approached by the steamer Claudine, apparently heading south by east, and bearing to the starboard beam of the barkentine; that subsequently, after a nearer approach, the said steamer showed her starboard light, and then, suddenly shifting her helm and blowing her signal whistle once, collided with the said barkentine, striking her on the starboard bow forward of the cathead; that, as a result of such collision, the barkentine sprung a leak, began to fill, then tipped over on her starboard side, and sank, becoming a total loss, with her cargo, freight, and all personal effects on board. It is alleged that before and during the time when said collision took place the said barkentine carried the lights prescribed by law; that such lights were brightly burning at the time, and could have been seen by the said Claudine, if she had kept a proper lookout, for as much as two miles, and in sufficient time to have avoided the said collision. It is further alleged that the said barkentine had a proper watch on deck at the time of and before the said collision, and that when the danger of a collision became apparent it was impossible for the barkentine to get out of the way; that before the collision the steamer Claudine, after suddenly shifting her helm, never slacked her speed, nor signaled to stop or reverse her engines, although she was going at a speed of about 10 knots per hour; that, if said steamer had continued on her course, instead of shifting her helm, and attempting to cross the bow of the barkentine, no serious damage would probably have ensued to either craft. The respondent denies that the collision occurred through any fault on the part of the steamer Claudine, and alleges that the barkentine was wholly at fault, in that her starboard light was improperly placed, and not visible from the steamer Claudine until such time as it was impossible by any maneuver to avoid a collision. Two libels were filed against the steamer Claudine in the lower court,—one by the appellee J. S. Low, as assignee of the owners of the cargo and freight of the barkentine, alleged to be of the value of $9,050; and one by the appellee John Piltz, master of the barkentine

at the time of the collision, to recover the sum of $2,474.30, alleged to be the value of certain personal effects on the said barkentine, and which were wholly lost by reason of the collision. By stipulation between the respective counsel the two actions were consolidated and tried together. Decree was entered in favor of J. S. Low for the full amount of his claim, with interest and costs from the date of collision, and in favor of John Piltz for the sum of $1,162.80, the value of articles proven to have been lost by him personally, together with interest and costs from the date of collision. The remaining amount claimed by the libelant John Piltz proved to have been for personal effects belonging to his wife, and, it not appearing that he was authorized to sue for or maintain an action for the same, this portion of the amount claimed was disallowed. An action was brought in the circuit court, First judicial circuit of the territory of Hawaii, for the value of the barkentine itself, and recovery had by the owners of the barkentine. The case was appealed to the supreme court of Hawaii, resulting in the same decree. An appeal was then prosecuted to this court, the circuit court of appeals for the Ninth circuit, but was dismissed by the court for want of jurisdiction. By stipulation the evidence and exhibits in the suit brought by the owners, George U. Hind and others, against the Wilder's Steamship Company, in the circuit court and supreme court of the territory of Hawaii, respectively, are used as evidence and exhibits in the present suit.

Kinney, Ballou & McClanahan (Nathan H. Frank, of counsel), for appellants.

Page, McCutchen, Harding & Knight and Paul Neumann, for appellees.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

MORROW, Circuit Judge, after stating the foregoing facts, delivered the opinion of the court.

The assignments of error are numerous, but relate entirely to the findings of fact by the court below, and its application thereto of rules of law. The appellees contend that this court has no jurisdiction over the appeal in this cause, for the reason that there is no provision of law directly authorizing this court to entertain appeals in admiralty from the district court of Hawaii. In support of this contention they cite section 86 of the organic act of April 30, 1900, providing a government for the territory of Hawaii, which section defines the jurisdiction of the district court of Hawaii as follows:

"Said court shall have, in addition to the ordinary jurisdiction of district courts of the United States, jurisdiction of all cases cognizable in a circuit court of the United States, and shall proceed therein in the same manner as a circuit court."

And with regard to appeals from said court it provides:

"Writs of error and appeals from said district court shall be had and allowed to the circuit court of appeals in the Ninth judicial circuit in the same manner as writs of error and appeals are allowed from circuit courts to the circuit courts of appeals as provided by law."

The appellees construe this section as making no provision for appeals from the district court except when acting as a circuit court, and contend that, as the circuit court has no jurisdiction in admiralty, there is no "manner" of allowing an appeal in admiralty from that court. The language of the section does not warrant such a restricted interpretation. It expressly provides that writs of error

and appeals from said district court shall be allowed to the circuit court of appeals in the Ninth judicial circuit. This jurisdiction conferred upon the appellate court is general and comprehensive. There is no exception, either in terms or by implication; and the provision that follows in the section that such writs of error and appeals shall be allowed "in the same manner" as they are allowed from circuit courts to the circuit court of appeals cannot be construed as creating an exception excluding appellate jurisdiction in admiralty cases because the circuit courts of the United States have no admiralty jurisdiction. Such a construction would defeat the appellate jurisdiction of the circuit court of appeals in nearly all cases arising in the district court of Hawaii, since the circuit courts of the United States have concurrent jurisdiction with the district courts in but few cases. No such purpose can be attributed to congress, particularly in view of the general terms of the appellate jurisdiction provided in the section. Besides, the phrase "in the same manner" has a well-understood meaning in legislation, and that meaning is not one of restriction or limitation, but of procedure. It means by similar proceedings, so far as such proceedings are applicable to the subject-matter. Phillips v. County Com'rs, 122 Mass. 258, 260. In Durousseau v. U. S., 6 Cranch, 307, 315, 3 L. Ed. 232, 235, section 10 of the act to establish the judicial courts of the United States (1 Stat. 73, 77) was under consideration. The section provided "that the district court in Kentucky district" should, in addition to the ordinary jurisdiction of a district court, "have jurisdiction of all other causes, except of appeals and writs of error hereinafter made cognizable in a circuit court, and shall proceed therein in the same manner as a circuit court; and writs of error and appeals shall be from decisions therein to the supreme court in the same causes as from a circuit court to the supreme court, and under the same regulations." It was contended with much show of reason that under this provision writs of error and appeals "from decisions therein" were intended to lie only from cases in which the district court acted as a circuit court; but Mr. Chief Justice Marshall held that this construction could not be tolerated, and in delivering the opinion of the court disposed of the contention in language applicable to the present case. He said:

"It would be difficult to conceive an intention in the legislature to discriminate between judgments rendered by the district court of Kentucky while exercising the powers of a district court and those rendered by the same court while exercising circuit powers, when it is demonstrated that the legislature makes no distinction in the cases from their nature and character. Causes of which the district courts have exclusive original jurisdiction are carried into the circuit courts, and then become the objects of the appellate jurisdiction of this court. It would be strange if, in a case where the powers of the two courts are united in one court, from whose judgments an appeal lies, causes of which the district courts have exclusive original jurisdiction should be excepted from the operation of the appellate power. It would require plain words to establish this construction."

In our view, this case is controlling, and disposes of the question of appellate jurisdiction of this court.

Proceeding now to the consideration of the case upon the merits, we notice that the appellants recognize the presumption arising from

the rule followed by this court that "in cases on appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the district judge, who had the opportunity of seeing the witnesses, and judging of their appearance, manner and credibility, will not be reversed unless it clearly appears that the decision is against the evidence." The Alijandro, 6 C. C. A. 54, 56 Fed. 624. But the appellants contend that the rule does not apply to this appeal, because the testimony relating to the substance of the case was taken either before a commissioner or read to the court from another case, and as to the main points in issue it cannot be said that the district court was in any better position to judge of the credibility of the witnesses and weight of the testimony than is this court. However this may be, as it is the object of an admiralty appeal to bring up the facts in the cause, and in a measure to have a rehearing on them, the evidence will be examined by this court de novo, due regard being had to the fact that two courts have considered the facts in this case, as far as the liability for the loss of the barkentine Carson is concerned (the district court of Hawaii in the case at bar, and the supreme court of Hawaii in the action to recover the value of the barkentine), and concurrent judgments rendered against the owners of the steamship Claudine, appellants herein. The burden is therefore upon the appellant to show that these decisions were manifestly wrong, before the judgment of the lower court will be disturbed. The Quickstep, 9 Wall. 665, 19 L. Ed. 767; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181.

The duty of steam and sailing vessels, respectively, with regard to avoidance of collisions at sea, is set forth in the revised international rules prescribed by the act of congress entitled "An act to adopt regulations for the prevention of collisions at sea," approved August 19, 1890 (26 Stat. 320, 327). They are as follows:

"Art. 20. When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel:

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

It appears to be admitted that the course of the steamer Claudine was E. $\frac{3}{4}$ S. up to the time her whistle was blown and she ported her helm; that between the blowing of the whistle and the collision a minute or more of time elapsed, and that at the time of blowing the whistle the steamer ported her helm, and changed her course to starboard; that the steamer's rate of speed was 10 knots per hour; that the rate of speed of the barkentine William Carson was $2\frac{1}{2}$ to 3 knots per hour; that prior to the collision the barkentine was sailing free, with all her canvas set, and her fore and aft sails on the starboard side; that up to the time the steamer blew her whistle and changed her course to starboard the barkentine kept on her

course, whatever it was; that the barkentine was struck by the bow of the steamer somewhere near the cathead on the starboard side; that the hour of collision was 8:40 or 8:45 o'clock p. m. on the evening of December 27, 1899, and that the place of collision was about 12 miles from Honolulu, at a point approximately E. ¾ S. from that point. The fact that the vessels did collide, and without any particular change of course by either until immediately prior to the collision, is strong prima facie evidence that they were proceeding in such a direction as to involve risk of collision. As said by the supreme court in the case of The Carroll, 8 Wall. 302, 305, 19 L. Ed. 392:

"The fact that the vessels did collide explodes the theory that there was no risk of collision; and, besides, why did the mate port his helm, if, in his judgment, there was no risk of it? He says this was done as soon as he saw the schooner. If so, he believed at the time the relations of the vessels to each other were such that they might collide, and the possibility of it is all that is required to charge the steamer, unless she can establish that she was without fault."

To overcome this prima facie case that the two vessels were proceeding in such directions as to involve the risk of collision, appellants invoke a preliminary note to article 17 of the international rules relating to two sailing vessels approaching one another in such manner as to involve risk of collision. This note contains the following suggestion:

"Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

Assuming that this note is a rule of navigation, and applicable to a vessel under steam approaching a vessel under sail, the appellants proceed to show from the testimony that the lights afterwards identified as being those of the barkentine did change in their bearings to the steamer; that with respect to the observations made on the steamer the lights of the barkentine appeared first on the port bow; that they kept gradually changing to the right, crossing the bow of the steamer, and afterwards appearing on the starboard bow. From this evidence the appellants draw the conclusion that no risk of collision was apparent to the steamer up to the moment she blew her whistle and ported her helm. The objection to this conclusion is obvious. In the first place, the preliminary note is not a rule of navigation, but merely a suggestion of one method of determining a risk of collision from a particular compass bearing of an approaching vessel. It does not determine or assume to suggest that all other compass bearings involve no risk of collision, nor does it suggest the only method of determining a risk of collision under the conditions mentioned. Manifestly, vessels approaching each other at about the same time on crossing courses, with compass bearings gradually changing, involve the risk of collision in the highest degree. It is only when the bearings alter quickly, and the vessels are a considerable distance apart, that there is no risk of collision. In the second place, the only purpose of this conclusion is to show that up to the time the steamer blew

her whistle and ported her helm she was without fault.' But, aside from the fact that the situation was one that does not justify any such conclusion, there is the further and still more serious difficulty that, where there is no risk of collision, a vessel that improperly alters her helm so as to bring about a collision will be held to be in fault. Mars. Mar. Coll. (4th Ed.) p. 381. If, then, there was no risk of collision, as contended for by the appellants, at the time the steamer blew her whistle and ported her helm, it follows as a necessary consequence that in porting her helm she brought about the collision, and was in fault. It is evident, therefore, that the theory of the appellants as to the duty of the steamer under any of these circumstances disclosed by the evidence does not excuse her from liability for the collision. It does not take into consideration the rule applicable to the whole situation, nor does it consider the fundamental rule of the sea, observed by admiralty courts ever since the employment of steam as a motive power for ships, that, where a sailing vessel and a steamer are proceeding in a direction that may involve collision, it is the duty of the sailing vessel to hold her course, and the duty of the steamer to keep out of the way,—a rule that is imperative, and admits of no option or choice. Spencer, Mar. Coll. § 89.

But what was the course of the barkentine, as shown by the testimony? Were the steamer and barkentine approaching each other on crossing courses? Capt. John Piltz, master of the barkentine at the time of the collision, and one of the libelants herein, testified that the barkentine was sailing free on a southwest course, and maintained that course to the time of the collision; that it appeared to him that the steamer was sailing on a course E. ½ S. He states that he was on deck, on watch, and that there were also on duty at that time the second mate, the man at the wheel, the lookout, and the man amidships; that the lookout reported a light on the starboard bow a few minutes after 8 o'clock p. m.; that about 8:25 p. m. the witness saw the red light of the steamer, and about 8:27 p. m. saw the green light also, both lights being visible at the same time; that he took the bearings of the steamer at that time, and judged that she was coming towards the barkentine about E. ½ S., and was about 3 miles distant; that about 8:35 p. m. the green light alone became visible. In the judgment of this witness the barkentine crossed the course of the steamer about 8:30 p. m., just prior to the shutting off of the red light from his vision. From 8:35 p. m. he continued to see the green light alone for three or four minutes. The steamer then blew one whistle, and changed its course to starboard, the collision occurring a minute or two later. It is his opinion that, if the steamer had not ported her helm, and changed her course immediately prior to the collision, no damage would have ensued, as the vessels would probably have cleared each other. Nelson, second mate of the barkentine, and who was on deck at the time, testified that the barkentine was sailing free on a southwest course; that he saw the steamer a little after 8 p. m., apparently coming right to the starboard side of the barkentine; that she was headed in a southeasterly direction; that

she saw both lights of the vessel for a few moments, and then could see only the green light; that when probably a half a mile off she appeared to head for the starboard quarter of the barkentine; that all at once she blew one whistle, and ported her helm, and then struck the barkentine on the starboard bow. McDonald, wheelman on duty on the barkentine at the time of the collision, testified that he took the helm at 8 o'clock that evening, steering the barkentine on a southwest course, and continued that course all of the time; that a few minutes after 8 p. m. he saw a light on the starboard beam, which he could make out was a steamer, apparently steering E. by S.; that he saw both red and green lights a little later, then lost the red light and saw the green light plainly, and then, just before the collision, lost the green light, and saw the red light again. This positive testimony as to the course of the barkentine is supported by the testimony of two expert witnesses, namely, J. R. Macaulay, a pilot in the port of Honolulu, and a seafaring man of many years' experience, who testified that with the wind free a vessel coming through the Oahu or Molokai channel to the port of Honolulu would take a southwest course; and Daniel McNeill, a master mariner, who had traveled on the waters around the Hawaiian Islands for 18 years, who testified that the course of a barkentine coming through the Molokai or Oahu channel with a free wind would be southwest. The first officer of the steamer Claudine also testified that the regular course of a sailing vessel going through this channel was southwest. In further support of the testimony as to the southwest course of the barkentine may be noted the testimony as to the direction of the wind and the position of the sails at the time in question. Capt. Piltz, of the barkentine, testified that the wind was about E. by N.; and Torstensen, the carpenter, stated that at 8 o'clock that evening, when he went below, the wind was about northeast. Nelson, the second mate, stated that the barkentine was running free on the port tack, with all the sails pretty well stuck out on the starboard side. McDonald, the wheelman, also stated that the barkentine was running free, with the main and mizzenmast booms to starboard.

The appellants claim that the barkentine was not on a southwest course, and base this contention in part upon testimony elicited by propounding hypothetical questions to various expert witnesses, to the effect that a southwest course for the barkentine was not possible if the steamer's course was E. ¾ S., and the libelant, who was on the barkentine, saw, as he testifies, first the port light of the steamer, then both lights of the steamer for the space of nine minutes, and then the starboard light alone. The inference which the appellants appear to draw from this testimony is that, as the libelant was able to see both lights of the approaching steamer for the space of nine minutes, the barkentine was not crossing the bow of the steamer on a southwest course, but was approaching nearly head on. The first observation to be made with respect to the hypothetical question that brought out this testimony is that the witnesses were not informed as to the speed of the barkentine during the nine minutes, and it is not clear how, in the absence

of such information, they were able to give expert testimony upon the subject. But the principal objection is that the estimate of time which the libelant made for his observation of both lights of the steamer cannot, under the circumstances, be considered as accurate or reliable, and cannot be made the basis of any inferences to rebut the positive testimony of witnesses as to the actual course of the vessel. A diagram showing the position of the two vessels at the time of the collision was also introduced, indicating that the course of the steamer at that instant of time was S. E., and the course of the barkentine was W. ¼ N. to W. ½ N. A chart or diagram is also attached to appellants' brief, showing the course of the approaching vessels just prior to the collision as claimed by the appellants. According to this chart, the course of the steamer was E. ¾ S., and the course of the barkentine was about W. ¼ S. That the barkentine was not on either of these courses is sufficiently established by the fact, as shown by the testimony, that the wind was either E. by N. or N. E., and the vessel was on a port tack. It is true that Nelson, the second mate of the barkentine, testified that the wind was south and east, but he also testified that the vessel was heading on a southwest course, sailing free with square yards. If the witness was correct as to the course of the vessel and her position before the wind, he was manifestly mistaken as to the direction of the wind; and Capt. Piltz so testified when this testimony of the second mate was called to his attention. Had the barkentine been sailing on a course either W. ¼ S. or W. ¼ N. or W. ½ N., and the wind E. by N. or N. E., she would have had the wind on her starboard quarter, and the port tack described in the testimony would have been impossible for a sailing vessel under headway. The port tack was, however, the proper sail to carry on a southwest course with the wind either north by east or northeast.

There is still another feature attending appellants' conjectured course of the barkentine, which must not be overlooked. If it were established as a fact that the lights of the steamer were seen on board the barkentine for the space of nine minutes just prior to the collision, and that the barkentine was on a course that brought her end on, or nearly so, to the steamer, then the light of the barkentine that was observed on the steamer did not appreciably change its bearings during that time, and the risk of collision must be deemed to have existed, under the suggestion contained in the preliminary note to rule 17, invoked by the appellants in a branch of the argument previously noticed, and it became the duty of the steamer, in that situation, to keep out of the way. It follows that the effort to establish a course for the barkentine other than that of southwest would not, under any of the supposed conditions, furnish a defense to the action, and, as that course has been satisfactorily established by the evidence, we are left to consider it with respect to the remaining aspect of the case.

Did the steamer exercise due care and diligence to keep out of the way of the barkentine? If the second mate, in charge of the steamer, saw the green light of the barkentine, no sufficient excuse is shown for

failure to keep out of its way. The testimony of ten men on the bark-
entine is that the side lights were burning at the time of the collision.
The carpenter states that it was his duty to prepare the lights; that
he did so on the night in question at the usual time, between 5:30 and
6 p. m., and put them on deck at the front of the cabin; that Mc-
Donald and one other man on watch at that time came and got the
lights; that he saw McDonald put the green light in its box, but
did not notice who it was that put the red light in its place; that
he saw it burning afterwards from the forecastle. McDonald, the.
man at the wheel at the time of the collision, recalled that he put
out the green light, and stated that about twenty minutes before
the collision he heard the captain ask the second mate if the lights
were burning, and the reply was, "Yes." Nelson, the second mate,
corroborates this testimony. He says that about a quarter of an
hour before the steamer struck the barkentine he looked at the
side lights of his vessel, and saw that they were burning brightly.
The captain of the barkentine and several other witnesses, including
the officer in charge of the steamer Claudine, testified that the
green light was burning when the barkentine sank. It is admitted
that such side lights could only be seen for a distance of about two
miles on a clear night. Several witnesses testified that it was rather
a dark night, though clear. In such case, when the bright light be-
came visible to the officer in charge of the steamer, it certainly was
incumbent upon him, in the exercise of careful seamanship, to give
close attention to the light, and have his own vessel perfectly in
command until it could be determined without doubt just what
the approaching vessel was, and its direction. Did he do this? From
his own testimony it appears that he was second mate of the steamer
upon that voyage; that he went on the bridge about 8:15 p. m.,
and that the only other person on deck was the quartermaster,
who was at the wheel; that about half past 8 he saw a bright light
ahead, bearing east, or three-quarters to half a point to port bow;
that he at first thought it was the Molokai light. It changed its
bearing a little to starboard, and he watched it for five minutes
or so. Then the quartermaster wished to be relieved, and the
witness went away for two minutes or so, to call the relief. When
he returned to the bridge, the light was still moving starboard, and
he said he thought it was a steamer, possibly, coming their way.
He stated that at this time there were two lights, bright lights,
close to each other. He watched them off and on for six or seven
minutes, and, not seeing any side lights, concluded it was a steamer
going the other way. He then left the bridge again to find the
captain, as the quartermaster had not been relieved. When he
returned, the lights looked to him about three-quarters of a point
on the starboard bow, and he concluded that he would pass on
the other side, and blow one whistle, to call the captain's attention.
He blew one whistle. The captain then came up, and, when shown
the light, said it must be a vessel going the other way, according
to this witness' testimony. He stated that the captain ordered the
vessel to keep on its course again. In the meantime the mate had
come up. He stepped forward to the scuttle, and said, "There is

a green light hard to starboard." McNeal, the second mate, said that he looked up to see what it was; that he could see nothing. He then walked over to the middle, and "all of a sudden we seemed to be right on top of her." An order was given, "Hard to port! Go round her bow!" but in an instant the vessels had collided. He also stated that when the boats were ordered made ready he went aft, and tried to hunt up the natives; that they were scattered here, there, and everywhere, but that after awhile he got enough together, and went off in one boat alongside the barkentine. This witness testified positively that the helm of the steamer was ported twice that evening,—once upon his orders before calling the captain, and once later by the captain. Alexander Fisher, quartermaster of the steamer, and on duty at the wheel at the time, testified that he kept his course until he got orders from the second mate to "hard port," when he blew one blast of the whistle; that in from 7 to 17 seconds from that time he received the captain's order to starboard the helm, and put the helm to starboard; that in about 7 seconds from that time the collision occurred, and in the meantime no further orders were received by him. He knew nothing of the lights of the bark-entine, as he was watching his wheel only. William Weisbarth, captain of the steamer, testified that he left the vessel temporarily in charge of the second mate, McNeal, telling him to keep the vessel on the course E. ¾ S., and went down into the cabin; that when he heard the whistle blowing he went onto the bridge, and the second mate pointed out on the port bow a bright light; that for a while he could not make out what it was; that he went to the compass, and found that the steamer was off her course about three points; that he told the second mate that the light was quite a ways off, and that the steamer had better be put back on her course; that he then gave the order "starboard" to the quarter-master. He stated that about this time the chief officer said, "There is a green light," and he (the captain) saw the green light at about the same time, and could then see the vessel with the four masts standing out plainly, coming on almost end on to the steamer; that he then sang out to the quartermaster, "Hard over," and jumped to the telegraph, and gave the signal to the engineer to stop and back the steamer, but it was too late to prevent the colli-sion. He further testified that he thought it was possible to prevent the collision if the engine had been stopped at the time the second mate blew the whistle. J. W. McAllister, chief officer of the steamer, testified that he was below when he heard the whistle blow, and immediately went on deck, to see what was the matter; that he went onto the bridge, and asked why the whistle was blown, and at that moment saw a light flash ahead abreast of the forerigging on the port side, and then said: "There is a green light. What are you doing on that side?" and that within 30 seconds the colli-sion occurred.

The federal courts in early cases declared it to be the duty of a steamer, when the lights of an approaching vessel were fluctuat-ing, or for any reason there appeared to be uncertainty as to her course, to slacken its speed, and, if necessary, stop, neither pro-

ceeding nor changing its course until the course of the other vessel has been ascertained. Hoben v. The Westover (D. C.) 2 Fed. 91; The State of California, 1 C. C. A. 224, 49 Fed. 172; The Huntsville, 8 Blatchf. 228, Fed. Cas. No. 6,915. This duty has not been diminished, but strengthened and increased, by subsequent decisions; the supreme court of the United States in the recent case of The New York, 175 U. S, 187, 207, 20 Sup. Ct. 67, 44 L. Ed. 126, after admonishing the vessel found to be in fault for not stopping and reversing when apprised of the nearness of an approaching vessel, stating in no uncertain terms that "the lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect." This duty, as embodied in the international rules, specifically requires that every steam vessel which is directed by the rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed, or stop or reverse. The officer in charge of the steamer Claudine at the time of the collision in question did not slacken her speed, stop, or reverse the engines when the uncertainty of the barkentine's identity and direction became apparent to him. In fact, his actions at that time, from his own testimony, reflect grave doubts upon his ability to command a steamer under such circumstances. For an officer to leave his vessel entirely without a lookout, especially when another vessel is known to be in the vicinity, is culpable negligence, and approaches very nearly the line of reckless navigation. The importance of the lookout and the high degree of vigilance required of the person occupying that position on a vessel, is clearly stated by the United States supreme court in The Ariadne, 13 Wall. 475, 478, 20 L. Ed. 542, 543, as follows:

"The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel, with all the property and the lives of all on board. The same consequence may ensue to the vessel with which his shall collide. In the performance of this duty the law requires indefatigable care and sleepless vigilance. * * * It is the duty of all courts charged with the administration of this branch of our jurisprudence to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of nonperformance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary."

No deviation from this statement has been made by the supreme court in later cases (The Oregon, 158 U. S. 186, 193, 15 Sup. Ct. 804, 39 L. Ed. 943), and it is therefore as binding to-day as when first made.

The appellants seek to overcome the presumption of negligence upon the part of the officer in charge of the steamer by the contention that the colored lights of the barkentine were not visible to those on board the steamer. The only testimony in support of this contention is that of McNeal, the officer in charge, and that is

not clear and convincing, in its nature. His confused manner of testifying, in connection with the lax methods and incorrect judgment exhibited by him, do not incline the court to accept his testimony as conclusively rebutting that given by the appellees to the effect that such lights did exist and were properly burning. There is perfect unanimity on the part of the witnesses for the appellees upon that point, and nothing appearing to cast any suspicion upon the verity of their statements. Sufficient details are given as to the preparation of the lights and their being placed in the proper places on that evening to warrant the conclusion, in the absence of convincing testimony to the contrary, that they were in place and burning.

It is further urged by the appellants that, if the lights were burning upon the barkentine that evening, they were obscured from sight ahead by the arrangement of the sails. Much theoretical testimony was taken upon this point, in the endeavor to show that, the lights of the barkentine being carried in the spanker rigging, the sails extending over the rail would cut off the lights from the range of vision ahead. As against this the appellees show that the barkentine was a new vessel, on her first voyage, from Eureka to Newcastle, thence to Honolulu; that she had been duly inspected by the United States inspector before leaving Eureka in January, 1899, and given a certificate of seaworthiness. The captain of the barkentine testified positively that the ship did not and could not carry her booms over the rails, and Campbell, the lookout on duty at the time of the collision, testified that he could see the side lights from the forecastle head as he walked across. If he is to be believed, it is evident that the lights could be seen straight ahead under the foresail. Mere theoretical contentions are not to be accepted against positive testimony of eyewitnesses, unless circumstances are shown to discredit the truth of such testimony. Such showing has not been made here. And, as is stated by Judge Thomas in The Gate City (D. C.) 90 Fed. 314, 317,—a case involving a similar state of facts in many particulars,—it is not a reasonable presumption that a sailing vessel would so adjust her sails as to obscure her light, upon whose appearance her own safety and the safety of other vessels might depend. Moreover, the mate of the steamer, coming on deck just prior to the collision, saw the green light of the barkentine at once. It is conceded that the barkentine had not changed her course, and the steamer had but just been given the order to change hers. It would seem, therefore, that the green light must have been visible to those on the steamer for some time before, if proper attention had been given to it.

The conclusion is unavoidable that the officer in charge of the steamer conspicuously failed to see what he ought to have seen, and, consequently, to direct properly the steamer's course. The liability therefore rests upon the appellants.

The decree of the district court is affirmed.