BONNAH et al. v. LAKESIDE S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1915.)

No. 2570.

1. COLLISION ⟋43—STEAM AND SAILING VESSELS MEETING—DUTY OF STEAMER.

A steamer bound under the rules to keep out of the way of a meeting schooner is not justified in taking a course which will barely clear, but should allow a sufficient margin for safety, taking into consideration the contingencies of navigation.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 43-47; Dec. Dig. ⟋43.]

2. COLLISION ⟋45—STEAM AND SAILING VESSELS MEETING—FAULT.

A collision between a steamer and a schooner meeting in Detroit river in the daytime during a high wind *held*, on the evidence, due solely to the fault of the steamer in failing to allow a sufficient margin for passing under the weather conditions, and that the steamer was also negligent, in that her lookout had at the time been temporarily ordered from his post.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. ⟋45.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty for collision by William Bonnah and Laura Bonnah, owners of the schooner John Schuette, against the steamer Alfred Mitchell; the Lakeside Steamship Company, claimant. Decree for claimant, and libelants appeal. Reversed.

F. H. Canfield, of Detroit, Mich., for appellants.
F. S. Masten, of Cleveland, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. This is a libel in admiralty on account of the sinking of the schooner John Schuette through collision with the steamer Alfred Mitchell in the Detroit river. The schooner was up-bound, under sail, and loaded with about 500 tons of coal. The steamer was down-bound, and carried 2,600 tons of iron ore. The collision occurred a little below the city of Detroit, about 6:30 p. m. of July 2d. Until just before the collision both the schooner and the steamer were sailing practically on the range, though neither was steering by the range. The river, for at least 1½ miles below and 3½ miles above the point of collision, was practically a straight course and entirely unobstructed. At the point of collision (and generally throughout the distance stated) the channel was one-half mile wide, extending at the point of collision to the American shore and dock line. The range was about 600 feet east of the American shore. At the time the two vessels sighted each other a stiff gale was blowing (probably 40 to 50 miles an hour), the wind being west-southwest, and thus upon the port quarter of the schooner, which had shortened sail.

There was some rain, but the weather was not thick, and a vessel could readily be seen 2 miles away. At about the time the Mitchell seems to have sighted the schooner (perhaps 2 miles away), the steamer Columbia, which was an excursion boat (a four-decker), was slightly astern of or about overhauling the schooner. The Mitchell and Columbia exchanged the usual port to port passing signals, the Columbia passing the schooner on the latter's port side, and after passing made something of a turn to starboard (how much of a turn is in dispute); the Mitchell likewise porting and making a turn somewhat to starboard, the two steamers thus passing port to port. As the Mitchell commenced to pass the Columbia, the latter cut the schooner out of the view of the Mitchell's master, who says he did not see the schooner again until the Columbia had passed, and when the schooner was about 700 feet from and heading toward the Mitchell. The collision occurred within a few seconds after the Columbia passed; the Mitchell's stem striking the schooner on her starboard bow with such effect that the latter sank almost immediately, at least 400 feet, and probably about 500 to 600 feet, from the dock on the American shore, her crew having barely time to escape in the yawl boat.

[1] Enough has been said to show that while, previous to the Columbia's intervening between the schooner and the Mitchell, it cannot be said that the Mitchell and the schooner would have collided, had each vessel kept its then course, yet, in view of the nearness and direction of their courses, including wind and weather and the contingencies of navigation, the situation did involve risk of collision. The applicable rules of navigation are clear and simple. It was the duty of the steamer to keep out of the way of the sailing vessel. Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 327, art. 20 (Comp. St. 1913, § 7859); Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 648, rule 19 (Comp. St. 1913, § 7929). This rule required the steamer to do more than merely to so shape its course as to pass the schooner without striking it. Its duty was to give the schooner a berth wide enough to allow a sufficient margin for safety, taking into account the contingencies of navigation. Spencer on Marine Collisions, § 87, and cases cited. A correlative obligation, however, rested upon the schooner to keep its course (28 Stat. 649, rule 20 [section 7930]); and if it negligently and improperly failed to do so, and the collision resulted therefrom, the steamer is not liable; but, the latter being under obligation to keep out of the schooner's way, the burden is upon it to show the prudence of its own conduct and the negligence of the schooner. Spencer on Marine Collisions, § 93. Upon the question of actual fault the testimony is in hopeless conflict, the crews, as usually happens, "standing by" their respective ships; and a conclusion of fault must rest, not upon absolute mathematical demonstration, but upon the reasonableness of the respective theories as applied to established facts, under the application of legal presumptions and the burden of proof.

The Mitchell's claim is that she kept her course without variation, and that, had the schooner not changed her course, the two vessels would have passed port to port at a safe distance apart, estimated

at about 200 feet, and that the collision was caused by the schooner's taking a sharp and sudden sheer to port—"shooting" directly across the Mitchell's bows—and with such force and directness that (as thought by one of her officers) the schooner (had she kept on the sheer) would have gone clear to the dock on the American side, had she not collided with the Mitchell, which saw the danger too late to avoid collision. The schooner's navigators, on the other hand, insist that the schooner did not sheer, but kept her course without variation.

[2] The District Judge was of opinion that the collision resulted through the sheer on the part of the schooner, that the latter was solely at fault, and dismissed the libel. None of the testimony was taken before the court, and such advantage as comes from seeing and hearing the witnesses was absent. Upon a careful consideration of the testimony, we are unable to agree with the conclusion of the District Court. The only important testimony from impartial sources is that of a watchman at the dock of the Engineering Company's works (on the American side), directly opposite which the collision occurred, and that of the Columbia's wheelsman. These witnesses agree that until after the Columbia had passed the schooner the latter kept her course—to use the wheelsman's language, "as near as she possibly could she was running the ranges right through there"; the Columbia, according to the watchman, passing the schooner at a distance of about 100 feet, and according to the Columbia's wheelsman, at a distance of about 200 feet. The watchman says that the Columbia, after passing the schooner, turned rather sharply across the latter's bows, which accords with the testimony of the schooner's navigators. The Columbia's wheelsman says he ported a little after passing the schooner, and, in effect, that the Mitchell made the same movement in passing the Columbia. The watchman says that he saw no sheer on the part of the schooner, although admitting that she might have luffed slightly into the wind without his noticing it. He seems to have anticipated the collision earlier than any one else, from the fact that the regular courses of the two boats seemed to be coming together. The Columbia's wheelsman says that when he looked back after passing the Mitchell the schooner had "luffed up a little to the American shore," and that the Mitchell "did not have room to pass her," giving it as his opinion that, had the schooner not changed her course, the Mitchell would have passed her with a clearance of easily 200 feet.

We are satisfied that the schooner did not voluntarily change her course. She was apparently being carefully and intelligently navigated, and was not a hard steerer. The only plausible suggestion made to account for the alleged sheering is that it was caused either by the Columbia's suction or by the "blanketing" of the schooner's sails through the shutting off of the wind while the Columbia passed, thus causing a luffing, or that on passing the Columbia the schooner encountered an unusual puff of wind, which caused her wheelsman to ease her off by throwing her into the wind. It is entirely possible that there was some suction, or some luffing resulting from the blanketing of the sails; it is also possible that the schooner was drawn more

into the wind as the result of the weather met after passing the Columbia. Such slight change of course on the part of the sailing vessel might not unnaturally occur under existing conditions, and is among the contingencies of navigation naturally to be anticipated. Indeed, it is because of the schooner's inability to control her movements absolutely that the burden is put upon the steamer to keep out of the schooner's way. A slight change of course resulting from either of the causes stated is consistent with the impartial testimony referred to. But that the schooner took a sharp and sustained sheer—shooting across the river in front of the Mitchell (to use the characterization of each of her three officers who were sworn) —does not impress us as reasonable, except on the theory that the schooner's master completely lost his head, a theory not sustained by the evidence. The record indicates to us that the Mitchell, under the circumstances presented, failed to give the schooner the wide berth demanded, allowing insufficient margin of safety to meet the contingencies of navigation which should have been anticipated. The range was, it is true, the usual sailing course for both up and down bound vessels; but if, under the conditions existing here, the Mitchell saw fit to hug the range, with several hundred feet of good water on her starboard hand, and 2,000 feet on her port side, she did so at the risk of responsibility for collision of which there was reasonable danger.

The testimony on the part of the schooner is that the Mitchell, up to the time her view was cut off by the Columbia, was seen over the schooner's starboard bow. This is corroborated by the testimony of the Columbia's wheelsman, who likewise saw the Mitchell over the Columbia's starboard bow. We think this testimony entirely credible. True, this does not mean that collision was bound to occur; but it does suggest risk, and the necessity of careful navigating on the Mitchell's part. The testimony of her officers is unsatisfactory and far from convincing, and lack of prudent navigation is strongly suggested by the fact that at the time of the collision, and for quite a little time before, the Mitchell was running without a lookout; her master having sent both the lookout and the second mate aft to look after some hatch covers which started to blow overboard. While this errand was proper for some one to perform, there was no emergency requiring that the lookout leave his post; and under the circumstances presented, including the necessity of passing both the Columbia and the schooner in close quarters, with a gale blowing, we think the absence of the lookout was gross negligence, which of itself throws upon the Mitchell the burden of showing that the collision was not the fault of that vessel. The George W. Roby (C. C. A. 6) 111 Fed. 601, 612, 49 C. C. A. 481, and cases cited; Wilder's S. S. Co. v. Low (C. C. A. 9) 112 Fed. 161, 172, 50 C. C. A. 473. True, the absence of the lookout would not make the steamer liable, if the collision would have occurred had the lookout been at his post; but we are unable to reach the latter conclusion.

The learned District Judge seems to have been considerably impressed with the view that the Columbia would have passed the schooner on her starboard, rather than on her port, side, had the conditions been as claimed by the schooner; but, in view of what we

have already said, we think this condition not strongly significant. The testimony does not satisfactorily show that the Mitchell's stem struck the schooner's bow at a broad, rather than at a sharp, angle. The wreck was blown to pieces as an obstruction to navigation, and there is no proof of her condition as shown after she sank.

We are also unable to see that the collision, as claimed by the Mitchell, would necessarily have carried the latter toward the Canadian rather than the American side. According to all the testimony, the schooner was struck on her starboard bow, and if the blow was delivered while the steamer was practically on the same course as the schooner, it seems to us not unnatural that the latter would have behaved as she did, viz., her bow turned about until she was practically headed downstream; she being carried but a comparatively short distance out of her course. We cannot escape the conviction that the Mitchell must be held solely at fault for the collision in not keeping out of the schooner's way.

The decree of the District Court is accordingly reversed, with costs, and the cause remanded, with directions to enter the usual decree establishing the Mitchell's liability, and for an accounting of damages.