## THE PILOT BOY.

### (Circuit Court of Appeals, Fourth Circuit. May 8, 1902.)

### No. 424.

**1. COLLISION—STEAMER AND SAILING VESSEL—BURDEN OF PROOF.**

In case of a collision between a steamer and a schooner, the steamer is presumptively in fault, it being her duty, under the rules, to keep out of the way; and the burden rests upon her, in order to avoid liability, to show that she took the proper precautions, and that they would have proved effective if the schooner had not changed her course.[1]

**2. SAME—LOOKOUT.**

It is the duty of a steamer to have a trustworthy lookout, properly stationed, other than the officer of the deck or the helmsman; and the absence of such lookout in case of collision is prima facie evidence that the collision was caused by the steamer's fault, and casts upon her the burden of showing that the presence of the lookout could not have avoided the collision.

**3. SAME—EVIDENCE CONSIDERED.**

A collision occurred in the night between a steamer and schooner, which met in the narrow channel of the Stono river, along the coast of South Carolina. The steamer had no lookout, except the pilot, who was acting as helmsman, and was a competent and experienced navigator in those waters. He saw the lights of the schooner when a mile or more distant, and from that time kept close watch of her. According to his testimony, which was corroborated, without conflict, by a number of other persons on the steamer, some of whom were disinterested, when he approached nearer he gave a signal of one whistle, slowed down, and took the starboard side of the channel; the schooner then showing her red light. The signal was afterward repeated. On coming near the schooner, her red light disappeared, on which he at once reversed. Shortly after, the schooner's green light was shown, and the collision followed almost immediately. This testimony was not effectively contradicted by the witnesses for the schooner. Held that, upon such facts, the steamer was not chargeable with fault, but that the collision must be attributed to a change of course by the schooner.

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston.

J. P. K. Bryan (Trenholm, Rhett, Miller & Whaley and M. Rutledge Rivers, on the brief), for appellants.

Julian Mitchell, Jr. (Mitchell & Smith, on the brief), for appellee.

Before GOFF and SIMONTON, Circuit Judges, and KELLER, District Judge.

SIMONTON, Circuit Judge. This case comes up on appeal from the District Court of the United States for the Eastern district of South Carolina, sitting in admiralty. It is a case of collision in a part of the continuous water way of inland navigation along the Atlantic seaboard,—a highway much used by vessels of limited draught. The schooner Beulah Benton, of 36 tons register, 57 feet on her keel, 19 feet beam, and drawing 4 feet when loaded, with full complement of tackle, apparel, and furniture, left Edisto Island on the night of January 15, 1901, on a voyage to Charleston, S. C. Her regular

[1] See Collision, vol. 10, Cent. Dig. §§ 54, 257.

master was sick, and she was in charge of the mate, as master, with a crew of three men, besides himself. Her cargo consisted of 66½ bales of sea-island cotton, of which 34 bales were on deck. She had proceeded on her voyage, and had entered Stono river, above the mouth of Rantowles creek. She had the wind abeam, blowing fresh. Her course was about N. N. E. She had up mainsail, topsail, foresail, and jib, on the port side, and was proceeding about five miles an hour. About the hour of 4:40 of the morning of January 17th, she sighted the light of the steamer Pilot Boy, which was on her voyage from Charleston to Beaufort, S. C., approaching her in the same river. In a short time afterward the schooner and steamer came into collision, the steamer striking the schooner at an angle of about 45° on her starboard side, between her masts, and cutting her nearly in two. The schooner filled with water, and her cargo was seriously damaged. The deck cargo was taken off at Hart's wharf, on the Stono river,—a place not far from the spot where the collision occurred. The schooner was towed to Charleston, the cargo in her hold unloaded, and the schooner repaired. The Pilot Boy is a side-wheel steamer, about ———— long, which for several years has run regular trips through these waters, by night as well as day, between Charleston and Beaufort. The accident occurred in that part of the Stono river which flows between John's Island and the mainland; having on the easterly side the broad and level marshes of John's Island, and on the westerly side similar marshes attached to the mainland. The exact spot of the collision was somewhere southward of the mouth of Rantowles creek. The witnesses differ as to its location. The schooner and the cargo were owned by different persons. The libel in this case was filed by both the owner of the schooner and the owner of the cargo, seeking damages from the Pilot Boy. Claim and answer were filed. Testimony was taken in the presence of the court. After argument, the libel was dismissed; the court holding the steamer without fault causing the collision. Exceptions were taken, appeal was allowed, and the cause is here on the assignments of error.

The testimony in this case offers no exception to the confusion and conflict which so frequently characterise the litigation over collisions in courts of admiralty. The salient facts, therefore, must be carefully noted. The principles of law governing cases of this character must be kept in mind and applied to these facts, as far as they can be, as disclosed in the testimony.

This is a collision between a steamer and a sailing vessel, occurring in a narrow channel in the nighttime. Under articles 20 and 21 of the sailing rules, when a steamer and a sailing vessel are approaching each other in such a direction as to involve risk of collision, the steamer must keep out of the way of the sailing vessel, carefully watching her movements, and the sailing vessel must keep her course. The reasons for this rule are given in New York & B. Transp. Co. v. Philadelphia & S. Steam Nav. Co., 22 How. 461, 16 L. Ed. 397. And the rule is enforced in very many decided cases. The Colorado, 91 U. S. 692, 23 L. Ed. 379. If the steamer fails to keep out of the way of the sailing vessel, she is responsible for the collision, unless the sailing vessel is in fault. The Sea Gull, 23 Wall. 165, 23 L. Ed. 90. When a steamer is

approaching a sailing vessel, the steamer is required to exercise all necessary precautions to avoid risk of collision. If this be not done, prima facie she is chargeable. Steamship Co. v. Rumball, 21 How. 372, 16 L. Ed. 144. When a steamer has notice that a schooner is before her and near her track, she is bound to take efficient measures to avoid the schooner. New York & V. S. S. Co. v. Calderwood, 19 How. 241, 15 L. Ed. 612. If she adopts such measures, and they would have been effective if the schooner had not changed her course, the steamer is not chargeable for the consequences. The Potomac, 8 Wall. 590, 19 L. Ed. 511; The S. C. Tryon, 105 U. S. 267, 26 L. Ed. 1026.

In the case at bar the schooner and steamer were approaching each other in a narrow channel. The lights of each were seen by the other. The collision having occurred, the burden is on the steamer to show that she took the proper precautions, and that these would have proved effective if the schooner had not changed her course. The Java, Fed. Cas. No. 7,233.

There is another rule of law governing cases of collision: It is the duty of every steamer navigating the thoroughfares of commerce to have a trustworthy lookout, besides the helmsman, and, in case of collision, the absence of such lookout is prima facie evidence that the collision was caused by the fault of the steamer. The Genesee Chief, 12 How. 443, 13 L. Ed. 1058. When acting as the officer of the deck, and having charge of the navigation, the master of a steamer is not a proper lookout. The Ottawa, 3 Wall. 269, 18 L. Ed. 165. Proper lookouts are persons other than officers of the deck or the helmsman, and they should be stationed on the forward part of the vessel. Id. Elevated positions on a steamer, such as the hurricane deck, are not as favorable situations for the lookout as those on the forward deck near the stem. In the case at bar the lookout was the helmsman on the hurricane deck. But the absence of a lookout is not conclusive of fault. It may appear that the collision could not have been guarded against by a lookout. The Farragut, 10 Wall. 334, 19 L. Ed. 946; The Annie Lindsley, 104 U. S. 185, 26 L. Ed. 716; The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711, 36 L. Ed. 469; The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519. Nevertheless the burden of proof in this regard also is on the steamer.

We must then look first to the testimony offered in behalf of the Pilot Boy, to see whether she adopted the proper precautions to avoid the schooner, and whether the absence of a proper lookout caused or contributed to the disaster. There are only two witnesses on the Pilot Boy who can speak, of personal knowledge, as to all the facts occurring just before the collision. These are Hamilton, the helmsman, and Townsend, an ordinary hand, who helped Hamilton at the wheel. Hamilton was the pilot and lookout. Other witnesses testify as to certain facts and circumstances attending the collision. These two alone can speak as to what occurred from the time the schooner was first sighted and the time when the collision became imminent. In order to understand the testimony, it is necessary to obtain some idea of the locus in quo. The Stono river, as it increases its distance from the ocean, becomes quite narrow. Its course about

the place of the collision is from the southwest toward the northeast. The points of the compass are stated approximately. It has several bends in its channel. On each side of the stream are wide flats covered with salt-water marsh. On the easterly side of the stream is the marsh of John's Island. Not far from the place of collision on this John's Island shore is a wharf or landing known as "Hart's Landing," sometimes called "Belvidere." On the west side of the stream are the marsh flats of the mainland. A creek of some size, known as "Rantowles Creek," flows from the direction of the mainland down toward the Stono, approaching close to it, then turns off northwardly, and, after another bend, enters into the Stono, almost in a due easterly direction. The collision occurred in the Stono above the mouth of Rantowles creek. Hamilton is a licensed pilot. Although he is illiterate, witnesses of the highest character—seafaring men—testify, of their own knowledge, that he is a competent and efficient pilot and steamboat man. He has been accustomed for 23 years to carry steamers through these narrow waters, and has been in charge of the Pilot Boy and her predecessor of the same name on their regular repeated trips through them for about 16 years. In his testimony he betrays some characteristic vanity,—a disposition to talk learnedly of his duties. But on the whole his evidence favorably impressed the court below, as it does this court. His account of the transaction is this: He first saw the schooner when he was in Stono river, about a mile below Rantowles creek. The schooner first showed her green light. A few minutes after the green light disappeared, and she showed a red light. Townsend, who was with him in the pilot house, says that Hamilton called his attention to the schooner; that at first he saw no light on her, but soon saw the red light. To this extent he corroborates Hamilton. It is well to say here that the witnesses were examined apart, none but the witness on the stand being present in court. Hamilton goes on and says that, when he reached the place at which Rantowles creek empties into the Stono, he gave one blast of his whistle. He did this, he says, to let the schooner know that he was coming, and slowed down on one bell. Townsend says that Hamilton said, when he did this, "I will slow down, because those fellows seem not to have much idea of what they are doing," and he gave one bell. At the same time, Hamilton ported his wheel. When he turned from the mouth of Rantowles creek, he again blew another blast. He did this, he says, to let the schooner know that he was going to starboard. He is corroborated as to these two blasts, and as to his slowing down, by Harris, Ferguson, and Phillips, all reputable witnesses; the first being a steamboat man and a passenger; the others being connected with the Pilot Boy. Hamilton further says that all this time he was observing the schooner off his port bow, showing a red light. In this he is corroborated by three witnesses, passengers on the Pilot Boy and not connected with her. One of these (Wineman) heard the first whistle and the one bell. Then he heard the second whistle. When he heard this second whistle he went to the port gangway of the Pilot Boy, where they put out the freight, and, looking out, he saw a red light coming down on the port side of the steamer. Benjamin Hart, Jr., also a passenger on the Pilot

Boy, heard the two whistles. At the second whistle he looked out of the forward gangway of the steamer, on the left-hand side, looking toward John's Island, and saw a red light. Cross, a colored preacher, also a passenger, who was in the cabin, heard both whistles. At the second, thinking that they had gotten to a landing, he rose and went on the left side of the steamer, abaft the wheel house. There is a small sort of deck just abaft the wheel house. Standing on that, he looked out, and saw a boat ahead showing a red light. Hamilton goes on and says that, seeing the red light of the schooner, he thought it was all right, as he was on a starboard helm, but in four or five minutes the red light suddenly disappeared, and a green light appeared. He gave the signal at once (three bells and a jingle) to stop and reverse; and then came the collision,—whether before the steamer got sternway on her, or not, he does not say. In this disappearing of the red light, and the showing of the green light, four or five minutes after the second whistle, he is confirmed by Wineman, Hart, and Cross. Mr. Harris heard the two blasts and the slow down and the three bells and jingle. He sprang out of his berth, leaned his body out of the window, and saw over the port bow of the steamer the glare of a red light, shut out by a green light, and then, very soon after, the collision. Bonneau, the engineer at his post, heard and obeyed the one bell, after the first blast heard the second blast, and some minutes afterward heard and obeyed the three bells and jingle. Kramer, a passenger (a man of excellent character), heard the blasts, the bell, and afterward the bells and the jingle, and then the collision. If this testimony be true,—and the trial judge, who saw the witnesses and heard their testimony, and was well acquainted with the character of most of them, believed it to be true,—it establishes these facts: That although Hamilton was helmsman, and on the hurricane deck, whilst he was not the proper lookout, yet he saw the approaching schooner promptly, observed her closely, and is corroborated by the evidence of others in the correctness of his observation. So the collision could not have occurred because the approaching vessel and her movements were not seen and watched, in other words, for want of a lookout. Another fact is shown by this testimony: Hamilton observed the precaution required when an approaching vessel is observed. He slowed down at once, and proceeded slowly and cautiously under one bell, still watching the schooner; for, just as soon as he saw the red light disappear, he stopped and reversed. He says that when he did so he put his wheel to starboard. By doing this, when the steamer got under way back, her bow would have been thrown to starboard; and, as he supposed the schooner was approaching him on his port side, she would probably have passed the bow of the steamer. Hamilton swears that he kept on the starboard side of the river, as he should have done under the rule of the road (article 21). It is clear that the collision did not occur from any negligence or default on the part of the steamer. So long as the Pilot Boy saw only the red light of the schooner, those on board of her could feel sure that there could be no collision. Just at the instant that this cause for security ceased by the disappearance of the red and the showing of the green light, every precaution which could have been taken to avoid a collision was adopt-

ed. This change in the lights of the schooner indicated that she had changed her course.

So far only the testimony of the Pilot Boy has been considered. The crew of the schooner say that they were proceeding with a fair wind against tide, on the port side of the stream, running along and close to the edge of the marsh, about 20 feet; that they kept that course until the collision without change. They saw the lights of the Pilot Boy when they were a little south of Hart's landing, and heard the first whistle after they had passed the landing. They saw her red light when the Pilot Boy was about the mouth of Rantowles creek, and then she showed both lights, coming down on the schooner. Their theory is that the Pilot Boy was on the side of the stream on her port side, and that she changed direction and came across the stream to the side the schooner was, and collided with her. This directly contradicts the testimony of the witnesses for the Pilot Boy,— especially Capt. Williams, who runs on this river in his boat, and who says that it is impossible to follow the shore line on the west side of the Stono, in the reach in which this collision happened, without getting aground. But be this as it may, the trial judge heard all these witnesses, weighed their credibility, and decided against the libelant. Examining carefully, as has been done, all the evidence in the case, we cannot see any error in this,—certainly none of such a character as would compel a reversal of his conclusion.

It is ordered that the decree of the district court be affirmed.