---

## THE ECHO.

### (District Court, S. D. Alabama. May 21, 1904.)

#### No. 1,016.

1. COLLISION—STEAMER AND TUG AND TOW MEETING—LIABILITY OF TUG.

Where the navigation of a fleet consisting of a tug and two barges in tow, one alongside having her own master and crew and the other on a line, is in charge of a pilot employed by the owners of the barges, who is on the first barge and directs all movements, the tug is not responsible for the position of the fleet in the channel, nor for the failure of the barges to carry proper lights, and cannot be held liable for a collision between the leading barge and a meeting steamer, resulting from a violation of the rules in either of such respects.

2. SAME.

Conflicting evidence considered, in respect to a collision in the evening between libelant's steamer, passing down the Mississippi opposite New Orleans, and a barge alongside of a tug passing up, and *held* not to sustain the burden resting on libelant to show fault on the part of the tug, either in relation to the lights carried, the signals given, or the position of the tow in the river, but to show by a preponderance of testimony that in all of such respects the tug was without fault, and that the collision occurred through the fault and negligent navigation of the steamer.

3. SAME—LOOKOUT.

A steamer passing down the Mississippi in front of New Orleans in the evening, where other vessels are liable to be encountered, should have a lookout other than the master, who has also other duties.

In Admiralty. Suit for collision.

W. S. Benedict and Gregory L. & H. T. Smith, for libelants.
Pillans, Hanaw & Pillans, for claimant.

TOULMIN, District Judge. The libel alleges, among other things, that the steamboat Alma was, on the night of November 22, 1902,

¶ 3. See Collision, vol. 10, Cent. Dig. §§ 143, 211.

coming down the Mississippi river, and when at a point in the current of the river nearly opposite Napoleon avenue, in the city of New Orleans, the tug Echo, slowly ascending the river, collided with her, crashing into the starboard side of the Alma, greatly damaging her, and causing her final total loss. The libel charges that the collision would not have occurred, had the tug Echo, in accordance with the navigation laws of the United States, displayed proper lights and answered the proper signals of the Alma; that the collision could have been avoided, or prevented, had the said tug Echo, with her barges in tow, displayed the usual and customary lights, as required by the navigation laws of the United States; that it could have been avoided, had said tug, in accordance with the laws and regulations pertaining to navigation on inland waters, given the proper signals, or properly answered in due time those of the Alma; and that it could have been avoided, had said tug been in her proper place in the river, viz., ascending near the New Orleans bank.

The first question raised on the evidence and argument is whether the Echo is, under the circumstances of the case, responsible for the faults or acts of omission of the pilot on the tow, or of the crew of the tow, even if such faults or acts appear to have caused the collision? My opinion is that, in respect to a compliance with the general navigation laws, the tug Echo, so far as her own lights and signals are concerned, would be liable for her own faults or acts of omission, but that, so far as the faults or negligent acts of the pilot or crew of the barge Pendleton are concerned, as regards their own vessel, the latter was a separate and independent vessel, and would be solely liable; that is to say, if the collision was caused by the failure of the Echo to carry and display proper lights, or to make the proper signals, as required by the rules, it would be liable. If the collision was caused by the failure of the Pendleton to carry and display the proper light, the tug Echo would not be liable therefor; or if the collision was caused by the tug and tow not being in their proper place ascending the river, according to the custom, the tug would not be responsible. The barge Pendleton had her master and crew in charge of her, and a special river pilot aboard, employed by her owners, to control and navigate the fleet, which consisted of the tug and two barges in tow. The tug was bound to obey the orders of the pilot, at least so far as they did not conflict with the navigation rules. This certainly was true as relating to the fleet's proper place in the river; and I think the tug's nonliability as regards the lighting of the barge equally clear. Spencer on Marine Collisions, § 123; Hughes on Adm. p. 119; Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591.

Under the authorities I have some doubt that I am correct in the opinion that the tug would be liable for the failure to give proper signals, irrespective of the tow pilot's orders, in view of the circumstances of this case. However, from my view of the case, this is immaterial.

There is a great volume of testimony in the case, and, as is usual in cases of collision, much conflict of evidence on important questions involved in it.

1. The charge that the Echo did not, in accordance with the navigation laws of the United States, display proper lights.

For libelants: Witness Heuer testified that he was master of the tug Woods, and with his tug passed down the river on the New Orleans side on the night of November 22, 1902, between 7 and 8 o'clock, and at or about Race street met the Echo and tow ascending the river on his starboard, and seemingly in midstream; that he saw one bright white light and one green light on the Echo, the white light on her masthead, and the green light right above her boiler deck, alongside of the pilot house. He said he would not swear that she did not have two white lights, but was almost sure she had but one. Landry was mate of the Alma, and was in the pilot house with the pilot. He saw a white light. It was on the mast. He did not know at the time whether the Echo was stationary or moving. He did not see any red or green light at any time until he got aboard the barge Pendleton after the collision. The Pendleton was in tow of and on the port side of the Echo. Brinker was the master of the Alma. He did not see any light on the Echo or Pendleton until the searchlight was thrown on them by the pilot of the Alma, which first attracted his attention to them, and this was when they were about 100 or 150 feet away; that after the pilot threw the searchlight on the tug and tow he saw a white light—one or two, not positive which. At no time saw a red or green light on the tug Echo. Up to the time the searchlight was thrown he had not seen the tug and tow, or any lights. After he was on the Echo he saw red and green lights on the roof in boxes abaft the pilot house. This witness said he was on the roof of the Alma, sitting near the bell, at the time of and for some 20 minutes before the collision. Lilley, the carpenter of the Alma, who was also in the pilot house with the pilot, saw the white light, and no other light. He first saw it ahead. His attention was called to the light by the pilot, and then the pilot threw his searchlight on the tow. He said he would not swear that there was but one light on the mast of the Echo. He further said the boats were about heading each other. Childs, who was pilot of the Alma, testified that when he first saw the light on the Echo the Alma was near the bend on the right-hand, or Jefferson, side of the river. He saw white lights, and could not tell whether they were stationary or moving. As well as he could judge, they were about Louisiana avenue, nearest the Jefferson side. He steered towards the middle of the river, and as he got near the middle he saw a red light. When he saw the red light he pulled his boat hard to port, and supposes he was then about one-fourth of a mile above Stuyvesant docks. He first saw the tug and tow approaching him when he saw the red light. When he first saw the white light, it was on his starboard side. He saw the red light on the pilot house of the tug, and blew two whistles; but he commenced steering towards the New Orleans shore as soon as he saw the white light. He also said that, when he discovered the red light and blew two whistles, he saw a dark object coming right ahead for him. He put the searchlight on, but could not get it far enough around to see what it was. He also said that, when he blew the two whistles, the Alma and Echo were one-fourth or one-half a mile apart.

For claimant: Witness Meade testified that he was a licensed Mississippi river pilot, and was the pilot on the barge Pendleton on the

occasion of the collision. He was employed by the owners of the Pendleton, and was in charge of the fleet, composed of the tug Echo and the two barges, Pendleton and Texas, and directed the navigation of the fleet, in the course of which he gave orders to the master of the Echo, which furnished the motive power for the fleet. He testified that the Echo had two masthead lights, and a red and green light. The red and green lights were in light boxes screened. The Pendleton had a red light on her port side forward in the rigging. Pilgrim was master of the barge Pendleton. He testified that the tug Echo had two white lights in the mast, one above the other, three feet apart, and red and green lights in the screens on top of the pilot house. The red port light was over the rail of the barge. He could see it from his position on the barge. The lights on both tug and barge Pendleton were burning all right. Barry had no connection with either boat. He was sitting on the deck of the tug Schuh, moored on the Gretna side of the river. He saw the Echo and tow coming up the river and pass. He saw a red light and two bright white mast lights on the Echo, one above the other. They were three feet apart. Cornwall was a commission merchant. He had no connection with either boat, and no interest in the Echo. He was aboard the Echo as a passenger, going to the place of discharge of the Pendleton's cargo, in which he was interested. He saw a red light on the port side of the Pendleton. The Echo had a red and green light and two bright lights on her masthead. Bordman was master of a ferryboat from Louisiana avenue across to the Gretna side of the river. He was starting out from the ferry on New Orleans side, and observed the Echo and tow coming up the river. He saw a green light and two bright lights on the Echo. From the angle he was running he could not see the red light. The bright lights were on the masthead. He crossed under the stern of the tow just out from the Louisiana avenue. Eldridge, master of the Echo, testified that she was carrying a red and green light and two white masthead lights; that they were in order and properly burning.

The foregoing is substantially the evidence concerning the lights, on which I think there can be no doubt that the Echo had two white mast lights carried vertically, and on the starboard side a green light, and on the port side a red light, fitted with inboard screens, on or about the top of the pilot house. These are the lights required for steamers towing other vessels by the pilot rules for Western waters. See rule 10. The Pendleton was towed alongside of the Echo on her port side. According to the pilot rules referred to, she should have carried a red light on the port bow. It appears she carried a red light on the port side, not on the bow, but in the mizzen rigging, or forward in her rigging. But, even if the failure of the Pendleton to carry a red light on her port bow, as required by the rules, had been the cause of the collision, the Echo would not be responsible therefor, as hereinbefore suggested.

2. The charge as to signals.

Witness Landry testified that he heard no whistle blown by the Echo. The Alma blew two whistles, and pulled over to the port side, when the Echo was apparently about 100 yards distant from her. He heard

131 F.—40

no answer from the Echo. The Alma kept on full speed, closing on the New Orleans side of the river. When she blew her whistles, she turned her searchlight on the Pendleton. The Pendleton was then right on her. Brinker testified that his attention was first called to the tug Echo and tow when the searchlight was thrown on; that when he saw them he told the pilot to blow his whistle. He blew two blasts. He told him to blow the danger signal, and he then blew three blasts. He said he heard one whistle from the Echo in answer to the Alma's two. Lilley heard no whistle from the Echo prior to the collision. He heard two whistles from the Alma after she put the searchlight on the tow. The boats were about 250 to 300 feet apart. They were about heading each other when the searchlight was turned on the tow. The Alma starboarded her wheel, and then it was she put the tow on her starboard side. In another part of his testimony he said the two whistles were blown before the lights were flashed; the three whistles or danger signals an instant thereafter. The Alma was about 200 feet from the tow when she starboarded her helm. Childs testified that he heard no signal from the Echo prior to the collision. The Alma blew two whistles. He supposes she was then one-fourth of a mile above Stuyvesant dock. He said he blew the two whistles as the Echo had given no signal, and he got no response to his signals. He blew the two whistles when he saw a dark object coming right ahead for him. He also said, when he saw the boat (tug) moving, he blew three short whistles, and put the searchlight on, but could not see what it was. Meade, pilot on the Pendleton, testified that he saw the Alma coming down about one-half mile off, and ordered one whistle blown by the Echo, which was done. He heard no response or whistle from the Alma, and ordered the captain of the Echo to blow another whistle, which was promptly done. He still heard no whistle from the Alma. Pilgrim testified that when he saw the Alma the Echo gave her one whistle. The boats were about one-half mile apart. He heard no response. When the Alma got about half way, the Echo gave another whistle. When the Alma got pretty close, she threw her searchlight on and blew two whistles. This was a very short time before the collision, not more than two minutes. Barry was familiar with the Echo's whistle. Not long after she passed up the river by him, probably a half hour, he heard her blow one whistle, and in a short time thereafter he heard another blast of her whistle. He heard no other whistles. Cornwall saw the Alma, and when she was about one-half mile away the Echo gave a signal of one whistle. He heard no reply from the Alma. In a few minutes another whistle was given. The Alma did not respond, but when she got dangerously close she threw her searchlight on the tow and blew two whistles. The boats were not more than 100 feet apart at that time. Eldridge testified that when he first saw the Alma coming around the bend he blew one whistle of the Echo; that in a few minutes he blew again one whistle; that after the second whistle was blown the Alma came close to him and starboarded her wheel. When she flashed her searchlight, the vessels were right together. He heard no response to either of the Echo's whistles. When the Alma blew her two blasts, she was going across the Echo's bow.

The two blasts and the searchlight were almost instantaneous, immediately before the collision.

The pilot rules for Western waters provide that:

Rule 1. "When steamers are approaching each other from opposite directions, the signals for passing shall be one blast of the steam whistle to pass to the right and two blasts of the steam whistle to pass to the left. The pilot on the ascending steamer shall be the first to indicate the side on which he desires to pass; but if the pilot on the descending steamer deems it dangerous to take the side indicated by the pilot of the ascending steamer, he shall at once signify that fact by sounding the alarm or danger signal of three or more blasts of the steam whistle, and it shall be the duty of the pilot of the ascending steamer to answer by a similar signal of three or more blasts of the whistle, after which the pilot of the descending steamer may indicate by his whistle the side on which he desires to pass. The signals for passing must be made, answered and understood before the steamers have arrived at a distance of 800 yards of each other."

Rule 2. "If from any cause the signals for passing are not made at the proper time, as provided in rule 1, * * * and either boat becomes imperiled thereby, the pilot on either steamer may be the first to sound the alarm or danger signal, which shall consist of three or more short blasts of the steam whistle in quick succession. Whenever the danger signal is given, the engines of both steamers must be stopped and backed until their headway has been fully checked."

Witness Brinker was clearly mistaken in saying that he heard one whistle from the Echo in answer to the Alma's two whistles. He is not corroborated by either of the other witnesses for libelants, and he is directly contradicted by the witnesses for claimant who testified on the subject. The latter testified that the Echo blew one whistle when the Alma was about one-half mile away, and a few minutes thereafter blew another whistle, and received no response to either, and that the Echo blew no other signal until after the collision. The evidence that the Echo blew no whistle at all before the collision is wholly negative. It is simply to the effect that the witnesses heard none, while the evidence for the claimant on that subject is distinct and positive that she blew two separate blasts. There can be no doubt from the evidence that the pilot of the Echo was the first to indicate by one blast of her whistle the side on which he desired to go, and that the Alma did not answer the signal, or blow her whistle at all, until at or about the time the searchlight was displayed; that the Echo's first whistle was blown when the boats were one-half mile apart, and the Alma's two whistles when they were not more than 100 to 200 feet apart. If the pilot of the Alma deemed it dangerous to take the side indicated by the pilot of the Echo, the rule required that he should at once signify that fact by sounding the alarm or danger signal of three or more blasts of his steam whistle. This he did not do, and the pilot of the Echo had a right to suppose that the signal of one blast, indicating that he desired to pass to the right, was heard and was satisfactory to the pilot of the Alma. I think it clear that no signal for passing was made at the proper time by the pilot of the Alma, and no proper signal indicating on which side he desired to pass. His reason for not giving the signals prescribed by the rule may have been his failure to hear the Echo's whistle, or it may have been that he did not deem it dangerous to take the side indicated by the pilot of the Echo, or, being already on and

descending the Jefferson, or right, side of the river, he did not consider it necessary to give any signals at all. But, as provided by rule 2:

"If from any cause the signals for passing are not made at the proper time, and either boat becomes imperiled thereby, the pilot on either steamer may be first to sound the alarm or danger signal, which consists in three or more short blasts in quick succession."

All the evidence on this point, except that of the pilot of the Alma, shows that the vessels were dangerously near together at the time the Alma blew her two whistles; and it shows that one or both of them were imperiled by the position they were in. When the pilot of the Alma saw the Echo and tow ahead of him, he threw the searchlight on them and blew two whistles, or blew two whistles and threw the searchlight. The evidence as to which was done first is contradictory. Whichever it may have been, it is shown that the two acts were very near together—almost simultaneous. The evidence is also contradictory as to whether the Alma blew the alarm or danger signal at all; but it is undisputed that she did not stop and back, or check her headway in the least, and it is equally undisputed that the Echo reversed her engine, and with the barge Pendleton backed until the latter came in contact with the barge Texas, which was in tow by a 50-foot line to the stern of the Pendleton, and that this occurred at or instantly before the searchlight was displayed. It is true the Echo did not answer the Alma's signals, made immediately before the collision, whether they were two blasts of the whistle or the danger signal of three blasts; but I think the evidence is agreed that nothing could then have been done to prevent the collision. Hence the failure of the Echo to answer said signals could not have been the cause of the collision, or in any wise have contributed thereto. It is also true that the pilot of the Alma testified that when he saw the red light of the Echo he blew two whistles, and that the two boats were one-fourth or one-half a mile apart at that time. But this evidence is not only inconsistent with the negative evidence of the claimant's witnesses, who heard no whistle by the Alma until immediately before the collision, but in conflict with the positive evidence of the master, mate, and carpenter of the Alma. Upon this evidence I can entertain no doubt that the Echo gave the signal of one blast of her whistle, and in due time, as required by rule 1 of the pilot rules, and that the Alma made no response of any kind to this signal; that the only signals given by the Alma were immediately before the collision occurred, and when it was too late for anything to be done by the Echo to prevent the collision.

3. The charge that the Echo was not in her proper place in the river —ascending near the New Orleans bank.

On this point there is greater conflict in the evidence than is found on the other points raised in this controversy. Before considering the conflicting evidence, it will be noted that there are certain conceded facts in the case. They are that the rule and custom was for vessels ascending the river to keep on the New Orleans side of the river, and for descending vessels to follow the bends or the middle of the river; that the collision occurred off the upper end of Stuyvesant docks, and

that said docks extend about one-fourth of a mile along the New Orleans shore, the lower end being at Louisiana avenue in that city; that Race street was about one and a half miles distance below; that the river at the point of collision is at least three-fourths of a mile wide; that the night on which the collision occurred was a dark starlight night, with no moon and no fog; that the barge Pendleton was a schooner-rigged vessel, full-ladened with a cargo of oil, and lashed to and along the port side of the tug Echo, with a flat scow-built barge, also with a cargo of oil, in tow by a 50-foot line behind the Pendleton; and that the Pendleton extended considerably forward and beyond the bow of the Echo.

Landry testified that when he first saw the white light of the fleet it was about 200 or 300 yards away on the Algiers side of the river; that he did not see the Echo at all, and did not see how the Pendleton was steering; that the Alma was coming down in the middle of the river just above the Stuyvesant docks; that the Alma pulled over to the New Orleans side, and the Pendleton came straight across the river to the New Orleans side, and struck the Alma on the starboard side about midships. He, however, said that he did not know the Pendleton was in motion until the searchlight was turned on her, and that this was done when she was right on the Alma. He also said that when the Alma blew her danger signal the two boats were so near together that nothing could have prevented the collision.

Brinker testified that his attention was first attracted to the Echo and tow when the searchlight was thrown on them; that they were heading quartering across the river to the New Orleans side, to the left of the middle of the river between the New Orleans side and the middle of the river, but nearer to the middle, and 100 to 150 feet distant from the Alma. The Alma was coming downstream to the right of the middle of the river, and at the time of the collision was heading a little towards the New Orleans side. Lilley testified that his attention was called to the light by the pilot, and when he first saw the tug and tow it was coming right ahead, the boats about heading each other; that then the searchlight was turned on, and the Alma starboarded her wheel and put the tug and tow on her starboard side; that this was a few minutes before the collision. He stated that at the time the searchlight was turned on there was nothing that would have prevented the collision. Childs testified that when he first saw the white lights the Alma was going down on the right, or Jefferson, side of the river, and steered to and descended in the middle of the river; that as near as he could judge the lights were about Louisiana avenue, nearer to the Jefferson side. As he got near the middle of the river he saw a red light, and then it was he saw the tug and tow approaching him, heading right across the river, and he supposed some 50 or 100 feet from him, and that he could have done nothing at that time to have avoided the collision. He further testified that, when he saw the tug and tow coming towards him, he "pulled hard to port, and was heading towards the city of New Orleans" at the point of collision, and the tug Echo was heading square across the river, pointing a little upstream, and that he was very near

Stuyvesant dock, on the New Orleans side, at the time of the collision.

Landry's evidence on the subject tends to support Childs, but their evidence is not very satisfactory as to the precise manner in which the collision occurred. I cannot accept their statements that the Echo and tow came straight across the river from the Jefferson side, and ran right into the Alma's starboard side. Their evidence is not only contradicted by the decided weight of evidence on this point, but it seems to me that there is an inherent improbability in their statements on the subject. If it be true that when Childs saw the Echo and tow approaching from the starboard side of his boat, heading square across the river from the Jefferson side, pointing a little upstream, and he then pulled the Alma hard to port and headed towards the city of New Orleans, and the Alma was running 10 miles an hour and the Echo and tow 3½ or 4 miles an hour, as shown by undisputed evidence, it is difficult to perceive how the Echo and tow overtook the Alma and ran into her starboard side, even if they were not more than 50 or 100 feet away at the time the Alma "pulled hard to port and headed for the New Orleans shore." It is, indeed, impossible to reconcile the evidence on the part of the libelants as to the position and course of the Echo and tow immediately before the collision, and to determine therefrom with any satisfaction such position and course; and equally difficult to reconcile their evidence as to the signals blown by the Alma, as to character, number and when made. Brinker testified that the Echo and tow were quartering across the river towards the New Orleans side, and were on the left side of the middle of the river; that is, between the middle of the river and the New Orleans side. The Alma was coming down the river to the right of the middle, headed a little towards the New Orleans side. Lilley said, when he saw the tug and tow, they were in the middle of the river, and they and the Alma were heading each other. The Alma starboarded her wheel, and put the Echo and tow on her starboard side.

On the part of claimant, Meade testified that the Echo and tow crossed from the Algiers side of the river to the New Orleans side far below Louisiana avenue, and came within 300 or 400 yards of the New Orleans side, and went straight up until they passed said avenue, closing in a little at the lower end of Stuyvesant docks, to about 200 or 250 yards from the New Orleans bank, and about one-fourth of a mile from the point of collision, and as they proceeded inclined a little in to the bank, to about 200 feet therefrom at the time of the collision, which occurred off the upper end of Stuyvesant docks. The witness first saw the Alma in the middle of the river. She crossed, heading quartering right towards the Echo and tow, pulled to port, and ran across the bow of the tow. Pilgrim, master on the Pendleton, and Cornwall, passenger on the Echo, testified substantially to the same effect. Barry and Bordman were neither on board of either boat, and both disinterested. The former testified that he saw the tug Echo and tow pass up the river near the New Orleans side about one-fourth of a mile above Jackson Avenue ferry and below Louisiana avenue; and the latter testified that he observed the Echo and tow

coming up the river near Louisiana avenue at about one-third of the river out from the New Orleans shore, leaving two-thirds of the river between the tow and the Algiers side of the river, and that at that time they were headed straight up and down the river, going upstream parallel with the shore. I think that the evidence is absolutely conclusive as to the fact that the Echo and tow were on the New Orleans side of the river, their proper place in the river according to the customary course of its navigation.

The burden is on the libelants to establish their case. Donald v. Guy (D. C.) 127 Fed. 228, and authorities therein cited. It is incumbent on them to point out some negligence or infraction of duty on the part of the tug Echo that contributed to the collision. They have done so in their libel, but have failed to sustain its allegations by the evidence. The decided weight of the evidence shows the Echo to be free from fault. But I think fault has been shown on the part of the Alma. It was manifestly an error for the pilot of the Alma to have starboarded her wheel, rather than ported it, at the time he "pulled her hard to port and headed for the New Orleans shore." If he was on the right of the middle of the river, as testified by Brinker and other witnesses, or in the middle of the river, as testified by himself and Lilley, for him to have changed his course and headed for the New Orleans side when he did seems to me to have been an inexcusable error. No reasonable excuse is shown why this was done. Had he kept his course down the river, as, under the circumstances, it was his duty to have done, and as the pilot of the Echo was justified in assuming he would do, it is clear there would have been no collision. He had abundant room to avoid the Echo and tow, having about two-thirds of the river open to him, and easy command of the movements of his boat. "A steamer having easy and perfect command of her own movements is bound to keep out of the way of a cumbersome tow going slowly, where there is nothing in the way to prevent her doing so." The Mayumba (D. C.) 21 Fed. 476.

There are indications, too, that the Alma was not keeping a proper lookout. She had no lookout other than the master. Although he was on the roof of his boat, sitting by the bell, he did not observe the lights on the Echo, or the whistles blown by her, or, indeed, know that she and her tow were approaching, until the searchlight was turned on them by the pilot of the Alma. "It is the duty of every steamer navigating the thoroughfares of commerce to have a trustworthy lookout, besides the helmsman. * * * When acting as an officer of the deck, and having charge of the navigation, the master of a steamer is not a proper lookout. Proper lookouts are persons other than officers of the deck or the helmsman." The Pilot Boy, 115 Fed. 873, 53 C. C. A. 329; Wilder S. S. Co. v. Low, 112 Fed. 161, 50 C. C. A. 473; The Ottawa, 3 Wall. 269, 18 L. Ed. 165; The Ariadne, 13 Wall. 475, 20 L. Ed. 542.

Upon the whole case my conclusion is that the libelants are not entitled to recover. A decree will be entered accordingly.