### THE MARSHALL O. WELLS.

### In re PERTH AMBOY DRY DOCK CO.

(District Court, D. New Jersey. September 16, 1909.)

1. COLLISION (§ 73*)—SAILING VESSEL AND FISHING BOAT—BURDEN OF PROOF.

Under article 26 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which makes it the duty of sailing vessels to keep out of the way of sailing vessels or boats engaged in fishing, and not in the fairway used by vessels other than fishing vessels or boats, a schooner which ran down a fishing boat, either anchored or fishing with trawls, to avoid liability, has the burden of showing that she was without fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 103; Dec. Dig. § 73.*]

2. COLLISION (§ 71*)—SCHOONER AND FISHING BOAT—FAILURE TO KEEP LOOKOUT.

A schooner *held* liable for the death of an occupant of a fishing boat, which was run down by the schooner while the boat was either anchored or engaged in fishing in New York Bay, and practically stationary, on grounds commonly used for catching lobsters; it appearing that the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

schooner kept no efficient lookout and that no one on board saw the boat prior to the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

In Admiralty. Suit by the Perth Amboy Dry Dock Company, as owner of the schooner Marshall O. Wells, for limitation of liability, in which Jacob Elzer, Sr., administrator, claimed damages for the death of Rudolph Elzer in collision. Claim for limitation allowed, and decree for damages in favor of claimant.

Cushman, Dewell & Cushman, for libelant.

McDermott & Enright (Jacob Fromme, of counsel), for respondent.

RELLSTAB, District Judge. On the 3d day of June, 1905, Rudolph Elzer, while employed on a small power boat, met his death in New York Bay, in consequence of said boat being run into and sunk by the schooner Marshall O. Wells. On the 20th day of May, 1907, Jacob Elzer, Sr., as administrator of Rudolph Elzer, brought suit in the Circuit Court of the United States for this district against the Perth Amboy Dry Dock Company, owner of the schooner, for $25,000 damages, alleging that said death was caused by the careless, unskillful, and negligent handling and managing of said schooner by the agents of the defendant. On the 17th of June, 1907, in order to obtain the benefit of the law of limited liability, said defendant filed a libel in this court against the said administrator and all other persons who had suffered loss or damage by said disaster. The libel is in the usual form of libels in causes of limited liability, setting forth the bringing of such action, libelant's sole ownership of the vessel, its size, capacity, value, business engaged in at the time of the disaster, and that it was then being navigated and controlled by a competent crew; denying libelant's responsibility for such death and liability for the collision; declaring its purpose to contest such action, and all claims by reason of said disaster; and praying for an appraisement of the value of its interest in said schooner, the issuing of a monition citing all persons claiming damages by reason of said collision to appear and make proof of their claims, and for an adjudication by this court of the matter in controversy, limiting its liability (if any be found) to the value of said schooner, etc., and the restraining of the further prosecution of the action brought by said administrator. In the third and sixth articles of its libel the libelant alleges the facts under which said collision took place, to be as follows:

"Third. That on the 3d day of June, 1905, the said schooner Marshall O. Wells, was on a voyage from a port in the state of New Jersey to New York, light, looking for cargo. That while proceeding on said voyage, and having arrived at a point between the lighthouse known as 'Robins Reef light' and the bell buoy near the same, a launch, boat, or skiff propelled by some kind of mechanical power, without any warning to those on board said schooner, crossed the bows of said schooner and brought herself into collision with said schooner. That at once upon it being discovered that the collision had upset the said power launch, boat, or skiff, and that one of the men from said power launch, boat, or skiff was in the water, the way of said schooner was stopped, and a boat launched, and an attempt made to rescue the said man.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

That said attempt being unsuccessful, although diligently prosecuted by the crew of the said schooner and the companion of the man who had been precipitated into the water by the collision, the said schooner proceeded on her voyage."

"Sixth. That on the said voyage of the said schooner Marshall O. Wells, at the time of the accident heretofore described, on the 3d day of June, 1905, the navigation and control of the said schooner Marshall O. Wells were in charge of a competent crew. That the collision which resulted in the sinking of the said power launch, boat, or skiff, and the drowning of the said Rudolph Elzer, were done, occasioned, and incurred without the privity or knowledge of your libelant and petitioner, as well as without any fault or negligence on the part of those in charge of the navigation and control of the said schooner Marshall O. Wells. Your libelant and petitioner believes, and so alleges the fact to be, that the said collision was brought about entirely by the carelessness and negligence of the said Thomas Lindsay and Rudolph Elzer, who were navigating and controlling said power launch, boat, or skiff, in attempting to cross the bows of the schooner Marshall O. Wells in an unlawful and improper manner."

Upon proofs taken the value of the schooner was determined to be $1,500. Thereupon the stipulation to pay said amount if the court should so adjudge, and the proof of claim and answer of said administrator were filed. The fifth paragraph of the respondent's answer contains the statement of the facts under which the disaster took place, as contended for by the claimant, which statement is as follows:

"Fifth. He alleges * * * that at the time of the death of said Rudolph Elzer, as hereinafter stated, and prior thereto, the schooner Marshall O. Wells was owned and, as he is informed and believes, under the control, management, and navigated by, the Perth Amboy Dry Dock Company, the above-named libelant, a corporation organized under the laws of the state of New Jersey, having its place of business at Perth Amboy, in the state of New Jersey, and that upon information and belief respondent's intestate, Rudolph Elzer, on or about the 3d day of June, 1905, was in a skiff upon the water of the bay of New York, between what is called the 'bell buoy' and Robins Reef light, Richmond county, state of New York, and while Rudolph Elzer was in said skiff as aforesaid said schooner Marshall O. Wells with great force and violence ran into and upon said skiff, thereby sinking said skiff, and wounded, bruised, and crushed the body of Rudolph Elzer, and threw the said Rudolph Elzer into the waters of said bay, thereby causing him to lose his life by drowning, without any fault of his own, but solely through the fault, carelessness, and negligence of the above-named libelant, Perth Amboy Dry Dock Company, its servants, agents, or employés; that it was the duty of said Perth Amboy Dry Dock Company, its servants, agents, or employés, at all the times hereinbefore mentioned, to carefully and skillfully move and propel, manage, and control said schooner, so as to avoid colliding with, striking, and running into said skiff in which said Rudolph Elzer was as aforesaid, but that said Perth Amboy Dry Dock Company wholly failed to perform said duty as aforesaid, owing to this carelessness and negligence, and that of its agents, servants, or employés, among other things in the following particulars: (1) That said schooner Marshall O. Wells was insufficiently and improperly manned and equipped for the voyage on which she was bound. (2) That she had no competent and sufficient lookout, properly stationed and attentive to his duty as such, and engaged in the proper performance thereof. (3) That said schooner Marshall O. Wells took no timely and proper steps to avoid the skiff in which said Rudolph Elzer was, as said schooner was bound by law to do. (4) That said schooner had no sufficient and competent man at the wheel. (5) That said schooner Marshall O. Wells took no proper steps whatever to avoid said collision or lessen the damages, thereby causing the death of said Rudolph Elzer, as hereinbefore stated, for which claim is made by the respondent for twenty-five thousand ($25,000.00) dollars damages."

The respondent prays for an adjudication that the loss was occasioned by the carelessness and negligence of said shipowner, etc., and that it occurred with the privity and knowledge of the owner of said schooner.

There is nothing in the evidence that suggests privity or knowledge of the libelant, and there is no contention by it that, if Elzer lost his life by the careless or negligent handling of the schooner, the damages recoverable equal the ascertained value of that vessel, viz., $1,500. It will be noted that the libel charges that the small motor boat (which hereafter will be called boat) was in motion, and that its navigator was trying to cross the schooner's bow at the time it was struck. The answer denies this, and charges that the boat was anchored at the time it was run down, and that the schooner had no competent lookout, and was carelessly and negligently handled, and that that was the cause of the disaster. If the boat was at anchor when struck, the liability of the schooner is clear. Wells v. Armstrong (D. C.) 29 Fed. 216–219; The Agnese, 97 U. S. 309–315, 24 L. Ed. 890; The Dean Richmond (D. C.) 103 Fed. 701, affirmed 107 Fed. 1001, 47 C. C. A. 138; The Michigan (C. C.) 52 Fed. 501–505. If the boat, when struck, was used in fishing, and was not obstructing the fairway used by vessels other than fishing boats, the schooner is liable. Article 26, Act August 19, 1890, c. 802, 26 Stat. 327, re-enacted by article 26, Act June 7, 1897, c. 4, 30 Stat. 96–102, 2 Fed. St. Ann. pp. 163–181 (U. S. Comp. St. 1901, p. 2883).

Of the four witnesses called to testify to the occurrence, but two saw the collision—Thomas Lindsay, the owner of the boat, and Joshua W. Taxter, the captain of the ferryboat Middletown. The witness John O'Conner, cook and deckhand, and William Spice, captain, of the schooner, did not see the collision, and knew nothing of it till afterwards. The undisputed evidence establishes that the boat was 21 feet in length by 6 feet in width, drawing about a foot and a half of water, propelled by a three horse power motor; that about 8:30 a. m., on June 3, 1905, at about flood tide, the weather clear, and a fair breeze from W. N. W., this boat, while at a point off Robins Reef, between the light and bell buoy northeast of the buoy, and about 400 feet therefrom, containing Lindsay and the deceased, was run down by the two-mast schooner Marshall O. Wells, running light, which had shortly before come out of the Kills under its own sails steered by the master, Capt. Spice, headed eastward for Red Hook, Brooklyn; that Lindsay saved himself by grasping the schooner's stays, drawing himself over its bow; that Elzer was knocked into the water and drowned; that both Lindsay and Elzer were fishermen, and had gone out to the reef that morning to trawl for lobster; that that was a regular place, frequently used by Lindsay and others, for lobstering; that the schooner was passing in the place customary for vessels to pass. The contradictory testimony relates to the situation of the boat and whether the schooner had a proper lookout.

As to the situation of the boat, whether anchored or in motion, and, if the latter, how and why moved, Lindsay testified that when they got to the reef the boat was anchored on the east bank, between the light and the bell buoy, northeast of the buoy and southeast of the light,

about 150 yards from both, in about 20 feet of water, there being about 13 to 15 feet of water there at low tide; that the higher part of the reef was between the boat and the light, there being about 6 feet of water on the reef; that he anchored, awaiting slack water before fishing, because the tide was too strong to lift the lobster gear; that his anchor was a regular 25-pound anchor, and he had 60 to 90 feet of rope out; that when he first saw the schooner it was coming from the westward out of the Kills, about a mile away, south of the light and west of the buoy, headed for the reef; that she crossed the reef between the buoy and the light; that when first seen the schooner was not headed for the boat; that she subsequently changed her course and struck the boat about amidships; that the schooner yawed considerably; and that as soon as it was apparent that the schooner was coming across the reef Elzer blew the horn, and continued blowing until the collision.

Capt. Taxter, of the ferryboat Middletown, called by the libelant, the only other witness to the collision, testified that he saw the boat and schooner about ten minutes before the collision; that the boat was but about 400 feet E. N. E. from the buoy, and not in the main channel; that she was on his port side, he being west of her; that both the men in her were standing up; that the man in the after part was hallooing and waiving his hands for about five minutes before the collision; that he couldn't tell whether the boat was anchored or stationary, not being close enough to see; that one man was in the stern, and the other as if in the act of pulling the trawl to lift the pots; that the boat did not change her position at any time; that he did not see her moving with power, and that she was not cruising; that she was moving along, lifting the trawls under the power had from pulling the trawl; that he did not see any pots, and could not say how far she moved; that she did not cross the schooner's bow, as far as he knew, and that all he knew was that the schooner hit her; that the schooner did not change her course from the time that he first saw her until after the collision; and that at the time of the collision he was 500 or 600 feet away.

The difference in the testimony of the witnesses Lindsay and Taxter as to whether the boat was at anchor is not so radical as to be irreconcilable. They agree substantially as to the location of the boat for some minutes before and at the time of the collision. Lindsay, as the only surviving occupant of the boat, and the one who operated the motor when the boat was cruising, was, of course, in the best position to know the fact. Taxter was at the wheel in the pilot house, directing the course of the ferryboat on its southern trip from New York to Staten Island. In one portion of his testimony he says he first saw both the boat and the schooner about ten minutes before the collision, and in another place he says five minutes. Taking the latter statement as the more probable, he would be a considerable distance from the boat when he first saw her, and he was never nearer than 600 feet. He does not say that the boat was not anchored. He does say that the men in the boat were conducting themselves so as to give him the idea that they were lifting up the trawls, and that the boat was moving along the line of the trawls. He was looking at the boat from a con-

siderable distance, and his testimony as to the motion of the boat was more an argument than an assertion of fact.

The testimony of Lindsay is that the anchor was down and held by a rope about 60 feet long, being attached to the stern. It would seem that, with such a length of rope out in water not more than 20 feet deep, a boat of this small size, even at anchor, might be moving from one trawl to another, so that both statements, Lindsay's that the boat was at anchor, and Taxter's that it was his idea that they were trawling, could be true. Again, what appeared to Taxter, at the distance he was, as trawling, might have been the lifting up of the anchor by one of the men in the attempt (if such attempt was made) to get out of the way of the oncoming schooner. It is the duty of the court to reconcile differences or inconsistencies in testimony, if it can be done without violating the principles of logic; and my opinion is that there is nothing in the testimony of the witness Taxter that is so contradictory of the positive statements of Lindsay that the boat was at anchor at the time of the collision as to prevent the court from concluding that the boat was at anchor as stated.

But, even assuming that the boat was in motion at the time of and during several minutes before the collision, there is nothing in the testimony of Taxter that suggests that the boat was cruising, or was being propelled by its motor, or was making any attempt to cross the bow of the schooner at the time of the collision. If it should be held that the boat was not at anchor, the utmost effect that could be given to Taxter's testimony is that the men were then engaged in fishing, pulling up trawls; the boat moving along as they proceeded from one trawl to another. In either case, whether the boat was at anchor or actively engaged in fishing, it was the duty of the schooner, under sail, under the rules already stated as to the duty of sailing vessels under way when approaching a boat at anchor or engaged in fishing, where a fairway is not obstructed, to keep out of the way of such boat, because, under the facts in this case, if the boat was not at anchor, but fishing, there was still a fairway open for the schooner to effect its passage.

Therefore, whether the court should find that the boat was at anchor or actually engaged in fishing at the time of the collision, the fault is the schooner's. In determining this question the court is unable to give any weight to the alleged admission of Lindsay, as testified to by both Spice and O'Conner. Neither of these men, according to their testimony, saw the boat at the time of or before the collision, or knew anything about it until after Lindsay appeared on the deck of the schooner. They both testified, however, that the first words of Lindsay were an admission that he had tried to cross the bow of the schooner. O'Conner gives the words as follows:

"I tried to get across your bows, Captain; but I couldn't. My other man is overboard."

If Lindsay, at the time of escaping the consequences of the collision, made the statement attributed to him, it would, in the absence of creditable testimony that the fact was otherwise, be persuasive evidence that the collision was directly due to Lindsay's recklessness in

steering his boat across the bow of the schooner. Capt. Taxter's testimony, however, coming from the only disinterested source, precludes the idea that this collision took place while the boat was making such an attempt. A man standing up and gesticulating, and hallooing for several minutes before the collision, suggests rather an attempt to divert the course of the approaching schooner than an attempt to cross its bow. Furthermore, such testimony, when given by officers or seamen of the hostile vessel, is to be scrutinized with great care and doubtingly examined, as such evidence is easily manufactured, and often is.

No credence whatever can be given to the testimony of O'Conner. Its examination reveals a remarkable lack of memory, to put it mildly. Capt. Spice, the master of the schooner, has a strong interest in the result of this controversy; and the changing of a word or two of the statement as attributed to Lindsay will produce a radical change in meaning. Lindsay had just crossed the schooner's bow in escaping the collision. His mate had not succeeded in escaping. If he said anything about crossing the bow of the schooner, it might have referred to his own crossing after the collision, or the failure of his companion to do so, and have had no reference whatever to the cause of the disaster. It requires no imagination to conclude that neither Lindsay nor either of the two men on the schooner was in a perfectly normal condition at the time Lindsay spoke. He himself would be under the excitement of the rapid events involving the collision, and the man on the schooner, not having seen the boat or the collision, would be startled by the sudden appearance of a stranger on the schooner's deck. I doubt whether any of the three could give an accurate statement of the words that passed between them under such circumstances.

In the absence of Capt. Taxter's testimony, this testimony of an admission of culpability on Lindsay's part could have little weight as a refutation of his testimony of the causes that led up to the collision; but with Capt. Taxter's testimony before us it is too improbable for belief. There is no evidence that would justify the conclusion that the boat tried to cross the schooner's bow. In my opinion the boat was without fault when run down by the schooner. The burden is, therefore, on the schooner to show that she was without fault, or that the collision was the result of inevitable accident. This burden the schooner has not met. On the contrary, the evidence shows conclusively that she was sailing a course where it was usual for fishing boats to be at anchor or fishing at the proper tide, and that she did not keep an efficient lookout as required by the rules. The City of Augusta, 80 Fed. 297, 25 C. C. A. 430; The Pilot Boy, 115 Fed. 873, 53 C. C. A. 329.

The witness Lindsay testified that, when it became apparent that the schooner was heading for the boat and was going to cross the reef, the deceased took and blew a horn to attract the attention of those on the schooner. Taxter said that he did not hear a horn, but that he did see a man at the stern standing up waiving his hand, and heard him hallooing, and that this was continued for several minutes before the collision, during which time the schooner was coming head-on. Lindsay did not say that any one was hallooing, but it may very well be that both the blowing of the horn and the hallooing took place;

the former not having been noticed by Taxter, and the latter done by Lindsay in the excitement induced by the extremity of that time. Neither Capt. Spice nor the witness O'Conner, the only two persons from the schooner that were produced as witnesses, saw the boat or knew of the collision until after it took place. They both say that there was a lookout on duty. His name is said to be Tompkins. Lindsay says there was no lookout when he climbed over the bow of the schooner immediately after the collision, that the captain alone was on the deck, and that he was at the wheel. According to the testimony of Spice and O'Conner, this man Tompkins left the schooner at 12 o'clock the same day, and never returned to it, and was never seen by either of them thereafter. The testimony fails to disclose any proper effort to locate this man Tompkins and produce him as a witness in this case, a circumstance that should not be overlooked. Assuming that Tompkins was a member of the schooner's crew, it does not follow that he was stationed as a lookout that morning, nor that, if he was so stationed, he was attentive to his duties. If he was attentive to such an important duty, how could he have missed seeing the boat, or hearing the hallooing of Lindsay, or the blowing of the horn by Elzer in time to give notice to the helmsman to deviate his course to avoid the collision. If a proper lookout had been maintained on the schooner, the boat on Robins Reef would have been seen by him as the schooner passed out of the Kills into the bay. Taxter testified that he had the schooner and the boat in view for about five minutes before the collision. What he saw and heard would have been seen and heard by an efficient lookout on board the schooner in time to avert the collision. This failure of duty on the part of the schooner was the sole cause of the disaster that overtook the fishing boat, and the libelant is legally responsible for the collision, and in damages for the death of said Rudolph Elzer.

This respondent is entitled to a decree for $1,500 damages, the full value of said schooner.